UNITED STATES, Appellee

v

DEWEY L. BARKSDALE, JR., Airman Second Class,
U. S. Air Force, Appellant

17 USCMA 500, 38 CMR 298

No. 20,779

May 3, 1968

 ██ ██ 

*Major Walter G. Fenerty* argued the cause for Appellant, Accused. With him on the brief was *Colonel Dwight R. Rowland.*

*Major Robert L. Bates* argued the cause for Appellee, United States. With him on the brief was *Colonel James R. Thorn.*

## Opinion of the Court

QUINN, Chief Judge:

A general court-martial at Dow Air Force Base, Maine, convicted the accused of falsely altering three Government checks by raising the original amounts for which they were drawn, in violation of Article 123, Uniform Code of Military Justice, 10 USC § 923, and sentenced him to a bad-conduct discharge, confinement at hard labor for six months and accessory penalties. With some modification of the sentence, intermediate authorities affirmed. Under Article 67(b)(2), Code, supra, 10 USC § 867, the Judge Advocate General of the Air Force certified the case to this Court for consideration of the following question: Was the board of review correct in holding that Prosecution Exhibit 6 was admissible in evidence? We also granted the accused's petition to consider the correctness of certain instructions as to the exhibit.

Prosecution Exhibit 6 is a written incriminating statement by the accused which he gave to Special Agent Daryl I. Gonyon of the Office of Special Investigations on May 25, 1967. At trial, defense counsel objected to its admission in evidence on the ground it "was not the product of the free will of the accused." After an out-of-court hearing, the law officer overruled the objection. The issue was again raised in open court, and the law officer adhered to his ruling. On review, the board of review determined there was "ample evidence to support" these rulings. It also independently assessed the evidence, and made its "own findings," from which it concluded the statement was "freely and voluntarily made." The accused maintains these determinations are not justified by the evidence. See Davis v North Carolina, 384 US 737, 16 L ed 2d 895, 86 S Ct 1761 (1966); United States v O'Such, 16 USCMA 537, 37 CMR 157.

Although the accused testified that he was interrogated by OSI agents at their office on four or five occasions, only two are material to this appeal. One interview took place on May 22, 1967; the other occurred on May 25, 1967. Either directly or impliedly, the accused admitted that before he was asked any questions at either interview, he was informed he was suspected of forgery; that he had a right to remain silent, but if he elected to speak whatever he said could be used against him in a court-martial; that he was entitled to a lawyer, either his own or one appointed by the Air Force, and the lawyer could be present during the interview; and, finally, that he could "just . . . [walk] out" of the office any time he wanted.

According to the accused, at the May 22d interview he was asked if he had committed the alleged offenses. He answered that he had not. He was accorded an "opportunity" to make a written statement of his denial, but was expressly advised that if he "wrote an untrue statement" he could be charged with perjury. He refused to make a statement, and left the interview room. At trial, he contended the reference to perjury constituted a threat. A threat to prosecute a suspect for a criminal offense unless he makes a statement is improper, and will render inadmissible a statement resulting from the threat. United States v O'Such, supra; United States v Scott, 8 USCMA 309, 24 CMR 119. The perjury remark, however, did not present prosecution as the alternative to reliance upon the right to remain silent. Cf. United States v Bruce, 9 USCMA 362, 26 CMR 142. On the

contrary, comments of that kind have a "dampening effect upon a person's willingess to speak," and are more likely to lead to silence than to speech. United States v Simpson, 17 USCMA 44, 46, 37 CMR 308. That is exactly what happened in this case. The accused left the interview room without saying anything.[1] It is also apparent the remark had no effect upon the accused at the May 25th interview. Nowhere in his testimony as to the circumstances which surrounded the making of the statement does he even suggest that the perjury reference influenced his decision to speak. The record of trial, therefore, compellingly demonstrates that whatever coercive effect the remark may have had on May 22d, its influence did not taint the interrogation of May 25th. United States v Cadman, 10 USCMA 222, 27 CMR 296; United States v Hogan, 9 USCMA 365, 26 CMR 145.

At the May 25th interview, the accused took a seat in the corner of the small interview room, as he apparently had on the previous occasions. Agent Gonyon, who mostly questioned the accused in the previous interviews, sat behind a desk; another agent, also present at the previous interviews, sat "with his chair next to the door." After advising him of his rights, Gonyon showed the accused the allegedly altered checks, and he identified his signature on them. Gonyon then asked him if an Airman Richmond Scott made the alteration on one of the checks; he replied in the negative. According to the accused, Gonyon showed him statements by Scott and another airman, which apparently implicated him in the offenses. Gonyon asked if he "would like to make a statement now." In reply, he said he "didn't want to answer any" questions. How-

ever, Gonyon "kept on asking them."[2] He threw the checks and statements on the desk, saying: " '[L]et's stop kidding around . . . and tell the truth.' " The accused insisted he didn't " 'want to talk about it.' " Gonyon pointed his finger at him and said: " 'I got all day and you'll be here all day too.' " The accused contended that he construed these remarks as meaning he "could not leave, . . . couldn't do anything but just sit there." He said to himself: " 'My rights have gone. I can't leave because he said so.' " For a time, Gonyon was "quiet"; then he left the room. When he returned he said to the accused: " 'You are guilty.' " The accused still "didn't say a word to him." Twice Gonyon asked him if he would make a statement. First he refused; then he "thought about what he [Gonyon] had said beforehand that . . . [he] couldn't leave, so . . . [he] went on and wrote a statement." At one point, in the interval between Gonyon's remarks about not leaving and the accused's decision to make a statement, he stood up, but almost immediately sat down without saying anything when Gonyon "hollered . . . '[y]ou're guilty.' " Finally, the accused testified that he made the statement "in order for me to leave." However, he admitted Gonyon made no move to restrain him, and the other agent near the door did not "show any threat of force." He also admitted he knew throughout the interview that he didn't have to make a statement, and he knew he "could have walked out."[3]

The statement is in the accused's own handwriting. It is prefaced by printed material as to the accused's rights at the interrogation. Some of this material was crossed out and initialled by

---

[1] The accused explained his refusal to make a written statement as follows: "[T]o me my right was that I didn't have to write a statement or make a statement."

[2] This statement was materially qualified in the accused's in-court testimony, which is set out later in the text.

[3] Although the accused's testimony in the out-of-court hearing before the

law officer is different from his testimony in open court, the parties have blended the two. In the circumstances, we need not separate the testimony to consider the validity of the out-of-court ruling on defense counsel's objection to admissibility apart from the in-court ruling. Cf. United States v Dicario, 8 USCMA 353, 24 CMR 163.

the accused. Each paragraph of the printed material was also initialled by him. A part of the printed matter reads as follows: "I do hereby voluntarily and of my own free will make the following statement without having been subjected to any coercion."

Agent Gonyon denied the accused said "anything, even closely related to wanting to leave" during the May 25th interview. He was "positive" the accused did not get out of his chair during the interview. He also denied the accused ever said, in words or substance, that he did not want to make a statement. Asked whether he had ever told any accused he could not leave the interrogation room until he had made a statement, he testified he had said "something to that effect" in another investigation, which he was "positive" did not involve this accused. To the "best of . . . [his] knowledge" that occasion was "the first, once and only time" he had ever employed that "technique" in interviewing a suspect.

When a person subjected to custodial interrogation indicates he wants to assert his right to remain silent, the questioning must cease; if it does not, and a statement is obtained through further interrogation, it is inadmissible in evidence against the accused. United States v Bollons, 17 USCMA 253, 38 CMR 51; United States v Westmore, 17 USCMA 406, 38 CMR 204. If the accused's testimony is believed, he had manifested a desire to rely upon his right of silence and his statement should have been excluded from evidence. However, if Agent Gonyon's testimony is believed, the accused willingly and freely waived his right to remain silent. Notwithstanding the law officer and the board of review resolved the conflict in testimony against the accused, appellate defense counsel contend the accused's testimony is so· "clear and definite" and Agent Gonyon's is so "vague and indefinite" that this Court should reverse their findings.

The burden of establishing a voluntary waiver of the right to remain silent is on the Government; and the evidence must "clearly and convincingly demonstrate" the waiver. United States v Bollons, supra, at page 257. Gonyon was certain and firm in his contention that the accused gave no indication, by word or act, that he desired to rely upon his right to remain silent. On the other hand, the accused was far from convincing in his assertion that he told Gonyon he did not want to answer any questions, but Gonyon "kept on asking them." Other testimony by him reveals this contention as his interpretation of what he said, not as a recital of what he actually said at the interview.

In his in-court testimony, the accused referred to his earlier meetings with Agent Gonyon. Questioned by his counsel as to the circumstances of these meetings, he stated that Gonyon asked him questions which, while phrased differently, "were the same"; his uniform answer to all these questions was " 'No.' " In the interviews in issue, he was asked the "same questions" as to whether he had "anything to do with the forgery or did . . . [he] have any knowledge of it." He kept saying " 'No' to them." Asked several times by defense counsel to explain what he meant in his use of the word " 'No' " he replied, variously, that he meant he "didn't want to answer his questions," and that he meant he "didn't do it or . . . didn't want to answer the questions." Putting aside the temptation to compare the accused's word usage with that of Humpty-Dumpty in Lewis Carroll's "Through the Looking-Glass and What Alice Found There," the inescapable conclusion from the whole of the accused's testimony is that he was, at all times, willing to be questioned by Agent Gonyon, but he reserved the option to refuse to answer specific questions. Cf. United States v Bollons, supra.

We turn to Gonyon's alleged threat to keep the accused "all day" in the interrogation room. We put aside consideration of whether a threat of deten-

tion for so limited a period and in such a place is, to a person of the accused's background, reasonably sufficient to affect his freedom to choose between speech or silence. Cf. United States v Walker, 9 USCMA 187, 25 CMR 449; United States v Hogan, supra. Gonyon insisted that the "first . . . and only time" he had ever made such a statement was in a different case. The circumstances of the May 22d interview with the accused support his testimony. On that occasion, as in the interview on May 25th, he showed the accused the altered checks and a statement by a witness implicating the accused. On that occasion, as in the early part of the May 25th interview, the accused denied any involvement in the offenses. According to his testimony, on May 22d he walked out of the interrogation room without making a statement, and he started to do the same thing at the May 25th interview, but apparently changed his mind. His testimony implies he did not leave because he thought the agent seated near the door would stop him. However, that agent was also present at the May 22d interview and, by fair inference, it would appear he was seated in the same place, yet he made no effort on May 22d to prevent the accused from leaving, although he had made no statement. The circumstances of the two interviews correspond so closely that they strengthen Gonyon's disclaimer of any threat to keep the accused in the room until he made a statement. Cf. United States v Mewborn, 17 USCMA 431, 38 CMR 229. Gonyon's testimony is given added weight by the accused's failure to utter a word of protest about the alleged threat. He admitted he knew and understood he "could have walked out at anytime during the interview." On May 22d, he had rejected Gonyon's invitation to make a statement and had left the interview room, without hindrance and at his own time. He admitted that in the May 25th interview, neither Gonyon nor the other agent made any attempt to restrain him when he allegedly "got up" from his seat. Considering all the evidence in this record, we are satisfied the accused's statement was not the product of any coercion or threat, but the result of his own voluntary decision to confess. It was, therefore, properly admitted in evidence.

In separate assignments of error, appellate defense counsel contend the instructions as to the court members' right to determine the voluntariness of the statement were prejudicially erroneous. The first assignment deals with an alleged material deficiency in the law officer's summary of the evidence pertinent to the issue. It is contended he should have advised the court members that they could consider evidence of the physical features of the interrogation room as bearing upon the voluntariness of the statement. The room was described as a single room, well lighted, but with no windows; it contained a desk, three chairs, and some ash trays. The walls were panelled with a sound-reducing material. Nowhere in the record is there the slightest indication that the physical features of the room had any effect upon the accused. The total absence of any connection between these factors and the reasons given by the accused for the making of the statement fully justified the law officer's failure to comment on them in his summary of the evidence. See United States v Davis, 2 USCMA 505, 512, 513, 10 CMR 3; cf. United States v O'Such, supra. Appellate defense counsel also contend the law officer prejudiced the accused by omitting mention of testimony by him to the effect that he was not properly advised as to his right to counsel. The evidence indicates no issue as to the correctness of the advice given the accused on this point.

Agent Gonyon testified he specifically advised the accused "he had a right to choose a lawyer of his own choice or . . . the Air Force would appoint a lawyer for him." In the out-of-court hearing, the accused did not dispute this testimony. On the contrary, he acknowledged he heard Gonyon's testimony as to the advice "concerning . . . [his] rights," and he admitted he "in fact" received such advice. He further admitted he understood he was "entitled to a lawyer." In his in-court

**505**

testimony on the limited issue of the voluntariness of his statement, the accused again admitted he had been advised of his rights and had heard "comments about counsel." He conceded he had read the printed matter at the top of the Air Force form on which he wrote his statement, and that he understood it. The printed matter included a paragraph, corrected and initialled by him, which, in material part, reads as follows: "He told me that I could obtain a lawyer of my own choosing or, if I wished, the Air Force would appoint a lawyer for me." Crossed out and initialled was the phrase "or a lawyer may be appointed for me"; a footnote indicated this phrase applied to civilians. On cross-examination, the accused testified as follows:

"Q. [Trial Counsel] What were the rights that he told you, you had?

"A. That I could come and go as I pleased or I could be silent.

"Q. Did he say anything with respect to counsel?

"A. Yes.

"Q. What did he say?

"A. That I had a right to have a counsel present.

"Q. *Did he say whether or not anybody would supply you with counsel?*

"A. No, sir.

"Q. You understood that you had the right to have counsel?

"A. Yes.

"Q. And have counsel present with you in the interrogation room?

"A. Yes." [Emphasis supplied.]

We do not construe the emphasized part of this excerpt from the accused's testimony as contradicting his earlier admissions that Gonyon had informed him the Air Force would appoint counsel for him. Trial counsel's question was imprecise, and apparently was construed by the accused to ask if Gonyon had advised him whether *a particular person* would obtain counsel for him. Consequently, his negative answer does not imply, as appellate defense counsel contend, that Gonyon did not tell him

counsel would be appointed for him if he did not choose his own. Considering trial defense counsel's alertness to the issue and the several objections he interposed to the admission of the statement, it is reasonably certain that if he had construed the quoted testimony as a repudiation of the accused's previous admissions, he would have advanced it as another basis for exclusion of the statement. See United States v Gordon, 14 USCMA 314, 34 CMR 94. We conclude that the accused's testimony did not raise any issue of incorrect advice as to the right to counsel. Cf. United States v McCauley, 17 USCMA 81, 37 CMR 345.

Finally, appellate defense counsel maintain the instructions were prejudicial in that they failed to inform the court members "what legal effect their resolution of the factual questions would have upon the issue of voluntariness." They contend the court members should have been separately advised that they must exclude the statement from their consideration, if they were not convinced beyond a reasonable doubt of either of two circumstances: (1) That the accused had not "expressed a desire not to answer further questions"; and (2) that he had not been told he would be compelled to remain in the interrogation room until he made a statement. We find no merit in either aspect of this assignment. The law officer advised the court members they could accept the statement as evidence only if they determined beyond a reasonable doubt it was voluntary; otherwise they "must reject the statement and disregard it as evidence in the case." He reviewed the accused's and Gonyon's testimony and instructed the court members that they must "determine whether and to what extent . . . either . . . should be believed, bearing in mind that the burden of proof is upon the Government and any reasonable doubt must be resolved in favor of the accused." In our opinion, these instructions adequately covered the "legal effect" of the alleged threat. Referring to the legal effect of the accused's alleged desire not to answer further questions, he instructed as

506

follows: "In this connection, the law requires that, when an accused . . . at any time . . . during the interrogation, indicates that he wishes to remain silent, the interrogation must be terminated. If the questioning is not immediately terminated, any statement thereafter obtained from the accused during that interrogation must be rejected as involuntary." These instructions were fully responsive to the evidence, and complete as to the law.

We answer the certified question in the affirmative, and affirm the decision of the board of review.

Judge KILDAY concurs.

Judge FERGUSON concurs in the result.