UNITED STATES, Appellee

v

CHARLES R. ENGLAND, Private, U. S. Army, Appellant

21 USCMA 88, 44 CMR 142

No. 24,002

December 3, 1971

Captain Norman L. Blumenfeld argued the cause for Appellant, Accused. With him on the brief were Colonel George J. McCartin, Jr., and Captain Richard A. Cooper.

Captain James T. Harper argued the cause for Appellee, United States. With him on the brief were Colonel David T. Bryant, Lieutenant Colonel Ronald M. Holdaway, Captain Walter A. Smith, III, and Captain Richard K. Bank.

## Opinion of the Court

QUINN, Judge:

This appeal challenges the correctness of a ruling by the military judge admitting into evidence incriminating pretrial statements by the accused.

Troung Thi Dung was shot and killed in the village of De Duc, Republic of Vietnam, by an American soldier. The next morning, the accused was questioned by Agents Nettie and Dowden of the Criminal Investigations Detachment. Preliminarily, he was advised by the agents that he was suspected of the murder of Miss Dung and of his right to refuse to be questioned and to have counsel at the interrogation. The agents testified the accused was also advised that if he elected to be questioned he would "be controlling the interview"; he could "stop it, merely by indicating that desire or desire to consult with counsel"; and, if he allowed himself to be questioned, he still did "not have to answer" particular questions. The accused acknowledged he understood his rights. He expressly indicated he did not want counsel; and, as defense counsel conceded in his argument on the objection to the admission into evidence of the pretrial statements, the accused also "consented to being questioned." About two hours later, after some conversation with the accused about his social activities with villagers, the agents "got to talking further," apparently about the offense, and the accused "stopped . . . was silent for a few minutes at which time he just said, 'Well, I shot her.'" The accused then led the agents to the place where he had put the rifle he had used. At that point, the accused and the agents went to lunch. After lunch, the accused participated in the preparation of a written statement in which he admitted that Miss Dung had been his girl friend; he had objected to her relations with other men; and he shot her from a distance of about three feet.

The crucial question on this appeal is whether, before the incriminating statements were made, the accused had indicated that he wanted the interrogation to stop. Both agents testified that, at all times he was with them, the accused was alert, calm, and cooperative, and at no time did he indicate that he wanted the questioning to stop.

A threshold question exists as to the evidence that can be considered in determining the issue. The initial defense objection to the admission of the pretrial statements was heard by the trial judge alone, at an Article 39 (a) session, Uniform Code of Military Justice, 10 USC § 839. At that session, the accused did not testify. However, part of the accused's later testimony in open court related to the interrogation. As a result, the instructions to the court members regarding their right to determine the voluntariness of the pretrial statements referred to circumstances recounted by the accused. In addition, the briefs and arguments in this Court mention the accused's testimony in support of the respective arguments. Since the parties have accepted the accused's testimony as part of the relevant evidence, we shall do the same for the purpose of this appeal. United States v Barksdale, 17 USCMA 500, 38 CMR 298, footnote 3 (1968).

Indisputably, the accused consented to being questioned. It is equally clear that he willingly and unhesitatingly answered questions about his likes and dislikes and his social activities with "local villagers." But for a period of about two hours, when asked a question involving "the incident," he just sat "and listened to what . . . [the agents] had to say and he smiled once in a while, but he neither" answered the question nor refused to answer it. However, sometime "[p]rior to the statement being made," the accused had admitted that he "had at one time given . . . [Dung] two hundred dollars."

In his own testimony, the accused acknowledged that throughout the interview with the agents he had never "[v]erbally" asked either agent "to quit questioning" him. Parts of the testimony important to this appeal are set out in the Appendix. Suffice it to note here his testimonial acknowledgment that, from "the first part of the interrogation, . . . [he] wanted them to know what had happened, but . . . [he] couldn't get . . . [himself] to say what . . . [he] wanted to say."

In explaining his ruling admitting the pretrial statements into evidence, the judge commented on the difference between the accused's ready answer to a question about his personal affairs and his silence in connection with questions relating to the "incident." He observed that the periods of silence suggested "a desire to exercise the right to remain silent." See United States v Bollons, 17 USCMA 253, 38 CMR 51 (1967). Portions of the accused's trial testimony demonstrate that at least some of the periods of silence were not occasioned by a desire to remain silent, but resulted only from the accused's inability to formulate "an answer in . . . [his] mind" or from the fact that he was "uneasy" and "couldn't get . . . [himself] to open up to" his questioners. That testimony, however, was not available to the judge when he ruled. Still, the judge concluded from the evidence before him at the time of his ruling that the accused had voluntarily consented to being questioned, and, that, in the course of the interrogation, he "never indicated that he wanted to terminate" the questioning. Referring to Barksdale, supra, he further concluded that the accused had elected to remain silent only in regard to specific questions. In our opinion, even the limited evidence relied upon by the judge for his ruling reasonably supports a conclusion that the accused "was, at all times, willing to be questioned . . . but . . . reserved the option to refuse to answer specific questions." United States v Barksdale,

supra, at page 504. It follows, therefore, that the accused's pretrial statements were properly admitted into evidence.

The decision of the United States Army Court of Military Review is affirmed.

Chief Judge DARDEN and Senior Judge FERGUSON concur.

## APPENDIX

"Q. What happened during this interrogation?

"A. The interrogation started off, I was told by Mr. Dowden that I was suspected of murder the night before, and that everyone had seen me in the village, they knew Charlie. . . . But the first part of the interrogation, I wanted them to know what had happened, but I couldn't get myself to say what I wanted to say. I was still confused, uneasy, and burdened because Miss Dung was not just a prostitute, another girl, she was a friend of mine and I had friends in the village of De Duc. I think it takes more than twelve hours or twenty-four hours to forget about it and say it just happened. Then the interrogation continued. They asked me questions concerning what I had done before. Questions pertaining to my life back in the States, my hobbies, my pastimes. . . . The interrogation was lengthened. I really wanted to end it, but at the same time I wanted to get it straightened out. The only conclusion I can draw out of this is because of this state of mind that I was in. It was about 11:30 or thereabouts when we broke for the noon meal, and to secure the weapon from Specialist Vaeena. We got the weapon, ate the noon meal, and proceeded back to the CID office. I was then asked if I would like to make a statement. At this time I said nothing. I was asked if I would consent to them asking questions, which I had no objection to—being asked questions. I was then asked questions, many questions concerning the incident the night before. When the questions were presented to me concerning the incident, at that time

I didn't wish to answer, or I couldn't get an answer in my mind. They then asked me about such things as my life back in the States, anything to get off the subject. And when they would get back on the subject, they thought that I would talk.

"Q. Why didn't you explain exactly what happened, like you did here today to the CID?

"A. I can't really say. Just what I said, I was uneasy, I was heavily burdened. I couldn't get myself to say it. I couldn't get myself to open up to them. I can only say it was due to the tension of that morning. I was heavily burdened, I was upset.

"Q. Did you answer some of the questions that the CID asked you?

"A. Yes sir, I did.

"Q. Did you make certain admissions that are contained in Prosecution Exhibit 5?

"A. Yes, yes I did.

.    .    .    .    .

"Q. Did you talk with Mr. Dowden or Mr. Nettie—at that time did you want to let them know what happened? Is this what you said just a few minutes ago in response to Captain Cooper's question?

"A. I wanted to, yes.

.    .    .    .    .

"Q. That morning, did you at any time ask Mr. Nettie or Mr. Dowden to quit questioning you?

"A. Verbally, no.

"Q. Did you ever, at any time, tell them that you did not want to make a statement?

"A. When I was first asked, yes.

"Q. Did you tell them that you did not want to make a statement, or did you just say no comment in response to their questions?

"A. I was—what I first told them was that I did not wish to say anything, that is when questions were in regards to my life before the Army. Later I was asked, after the noon meal, if I wished to make a statement. At that time I said nothing, and when asked if I wished to answer questions, or be asked questions, I consented to being asked questions.

"Q. Do you think you were tricked into making this? Prosecution Exhibit Number 5?

"A. I don't feel—I just don't feel at that time the interrogation should have went on. Myself, I don't feel I was in the condition to have went through it.

"Q. Did you think you were tricked into making this statement?

"A. I really couldn't say that I was tricked into it, no.

.    .    .    .    .

"Q. Do you remember whether or not Mr. Nettie or Mr. Dowden ever told you that you controlled the interview? That you could call it off at any time?

"A. I don't remember them saying that in those words. Possibly they did say it, but I don't remember.

"Q. But you don't remember that?

"A. I don't remember.

"Q. Some time elapsed from when you originally began talking to the agents about the incident and the time you signed the statement. Is that correct?

"A. Yes that's correct.

"Q. During that time before the statement was typed up, did you leave the CID office to get a weapon?

"A. Yes we left to retrieve the weapon about approximately at noon. We also went for the noon meal.

"Q. And it was after that that you went back to the CID office and at the time the paper was put in the typewriter and the first part of the statement was typed up. Is that correct?

"A. Yes, this was after chow.

"Q. And then they started giving questions, and you gave them answers. Is that right?

"A. Yes.

.    .    .    .    .

"Q. Didn't you know in your own mind, or didn't you feel that you could stop the interrogation at any time? Did you feel that you could have?

"A. In my mind then, I suppose that I felt that during the whole morning if I sat there and didn't say anything, tried to let them know the way I felt—but still the questioning went on and on all morning, so I guess—the frustration and constant listening to this interrogation, I wanted to make a statement and get this out of the way.

"Q. Were you told that if you asked them to stop the interrogation that they would? Did they tell you that?

"A. I don't remember.

"Q. Did you ever feel that if you just said, 'I don't want to be ques-tioned any more' that they would stop questioning you?

"A. Well that approach never came to me.

"Q. Excuse me go ahead.

"A. It didn't come to me that morning to tell them I didn't want to cooperate with you, and I don't want to say anything, I don't want to have an interrogation, because I knew it had to be made so it just seemed to be what was going to be.

"Q. And you knew that you controlled it?

"A. I knew then I didn't have to say anything, I could remain silent."