UNITED STATES, Appellee

v

BERNADOTTE R. GAINES, Private,
U. S. Army, Appellant

21 USCMA 236, 45 CMR 10

No. 24,385

March 10, 1972

*Captain Gary W. Allman* argued the cause for Appellant, Accused. With him on the brief were *Colonel George J. McCartin, Jr.*, and *Lieutenant Colonel Joseph A. Donahue.*

*Captain Robert C. Roth, Jr.*, argued the cause for Appellee, United States. With him on the brief were *Colonel David T. Bryant, Lieutenant Colonel Ronald M. Holdaway*, and *Captain Walter A. Smith, III.*

## Opinion of the Court

QUINN, Judge:

Brought to trial before a general court-martial, convened at Okinawa, the accused pleaded guilty to two specifications alleging robbery and not guilty to specifications alleging larceny and the murder of Sergeant Powers in the commission of a robbery. Convicted as charged, he was sentenced to a dishonorable discharge, confinement for life, and accessory penalties. On review, the United States Army Court of Military Review reduced the findings of guilty of felony murder to involuntary manslaughter, and modified the sentence by reducing the period of confinement approved by the convening authority from fifty years to twenty years. In this Court, the accused contends that two trial er-

236

rors prejudiced him in regard to the homicide findings of guilty and the sentence.

First, the accused alleges that the trial judge erred in admitting into evidence a pretrial statement in which he acknowledged that while he was engaged in robbing Sergeant Powers, Powers was stabbed in the chest. Some of his testimony at trial, as well as argument in his appellate brief, indicates the accused was not properly advised of his right to counsel at the September 5th interrogation, but the question crucial to this appeal is whether certain events in the previous three-week period demonstrate, as a matter of law, that he did not voluntarily waive his right to counsel at the interrogation.[1]

Criminal Investigations Detachment Agents Bolton and Ballow became acquainted with the accused in May 1969, during an investigation into a reported larceny. Initially a suspect, the accused eventually "was cleared" of involvement. Thereafter, he had frequent meetings with the agents, reporting to them about the use and availability of marihuana in the area. The accused was "on the street almost as much as" Agent Ballow, and Ballow often met him; he spoke with the accused so "many times both officially and unofficially" that he came to know him "pretty well," and "considered" him a friend. According to the accused, he similarly "considered" both agents his friends.

Powers was killed on July 1st. About August 1st, Ballow gave the accused some photographs of a man named Snead, whom he suspected of killing Powers, and asked the accused to help in locating him. On the morning of August 18th, the accused was called to the CID offices to be questioned about an alleged robbery. He had been identified as one of two persons who had robbed a taxi driver in the area of the Awase golf course. Ballow testified that before questioning the accused he advised him of the right to remain silent and the right to counsel, and the accused had indicated he did not want counsel and was willing to make a statement. When the accused had made "a partial statement," in which he denied participation in the robbery, he said he wanted to consult a lawyer. Immediately, the interrogation ended. An appointment was made by telephone for the accused to confer with a lawyer in the Judge Advocate Section. The accused was then "excused." He testified that he went to the Judge Advocate Section and conferred with a lawyer, who advised him "not to sign any statements" and "not to make any statements." Thereafter, he returned to the CID office. Coincidentally, Sergeant Reid, the victim of another robbery, was at the office; Reid saw the accused and immediately identified him as the person who had robbed him. According to Ballow, interrogation on the Awase robbery was discontinued; and later in the day, the accused was interrogated as to the Reid robbery.

Testimony by the agents and a certificate signed by the accused indicate the accused was fully informed of his right to counsel at the Reid robbery interrogation and that he did not desire counsel. The accused made two statements as to this robbery.[2] Shortly thereafter, he was placed in pretrial confinement.

[1] At trial, defense counsel observed that the accused "certainly did know what his rights were"; but he maintained that the accused's efforts to exercise his right to counsel "had been frustrated." In this Court, appellate defense counsel comment on discrepancies in the testimony of the agents, but they do not expressly contend that the advice given the accused was faulty. The trial judge indicated he was "inclined to agree" with defense counsel "that the real issue" was whether the accused had waived the right to counsel, but he made clear he had considered the "entire rights situation" in his ruling. He also fully covered in his instructions to the court members the question of the sufficiency of the advice given the accused.

[2] This offense became the subject of Charge I to which he pleaded guilty.

Between August 18th, the date of confinement, and September 5th, the date the accused made an oral statement in connection with the Powers killing, the question of his representation by counsel came up in two different situations. One situation consisted of separate periods of questioning by Agents Bolton and Ballow; the other situation involved the accused's representation in connection with the charges for which he had been confined. At trial, the accused sought to merge the two into a single issue.

On August 27th, the accused gave a written statement to Ballow, "to change . . . [his] previous statement" about the alleged robbery near the Awase golf course.[3] The next day, he made a written statement in which he admitted a robbery committed on August 11th. According to Ballow and recitals in written waivers signed by the accused, each statement was made after the accused had first been fully warned as to his right to counsel and counsel's presence at the interrogation. In his own testimony, the accused did not touch expressly upon these statements, but he admitted that "at times before" he was questioned on September 5th, he had been advised of his right to a lawyer before he made a statement. He said nothing to indicate that the waiver of his right to counsel in regard to each statement was the result of anything but his own free and voluntary choice. Finally, the accused referred to a visit to the CID office after his confinement. Without mentioning the circumstances of the discussion or whether he had been advised of his rights under Article 31, he testified he was informed that, as the result of a polygraph test, Snead had been cleared as a suspect in the Powers killing; he was asked whether he would take the same test in connection with the case. At first he refused, but later, he said: "[I]f . . . my lawyer says to take it, I'll take it." The accused testified that the agents responded as follows:

"They didn't say anything except that my lawyer would say no," and they "left it like that."

Regarding representation in connection with the charges for which he had been confined, the accused testified that after he had been in confinement for about eleven days, he filed a formal request for an interview with a lawyer. At one point in his testimony he fixed the date of the request as August 22d; elsewhere, he maintained the request was filed a "couple of days" before he visited the CID office, an event which could not have occurred, according to other evidence, before August 27th. A security guard, testifying as a defense witness, indicated the request was filed "just prior to . . . [the accused's] going to the hospital"; the transfer took place on August 29th. Whatever the precise date of the request, it is clear that it was made before the accused's first visit to the CID office, which his statement indicates occurred on August 27th. According to Bolton, the accused told them no one had "contacted him" and he wanted to know "who was going to represent him in court." Ballow telephoned the Judge Advocate Section "twice"; apparently once during the August 27th visit, and again on the August 28th visit. On the first call, he was informed that the "charge sheets had not been received"; on the second, he was advised "they didn't know who the counsel would be." After each call, Ballow apprised the accused of "exactly what" he had learned.

On August 29th, as a result of certain conduct in the stockade, the accused was transferred to the hospital for psychiatric evaluation. From about September 1st, he "repeatedly" telephoned Ballow. At trial, he gave two reasons for these calls. First, while he knew the agents were investigating him for "robbery," he wanted them to visit him at the hospital because he had no other visitors, and he regarded them as his friends. Sec-

---

[3] The Awase incident eventuated in a charge of larceny (Charge II and its specification), to which the accused pleaded not guilty.

ondly, the agents had assured him "they were gonna help . . . [him] get a lawyer," and he wanted "to find out who was . . . [his] lawyer." On one of the calls, apparently made on September 1, Ballow gave the accused a telephone number. The accused called this number, but got no response. He telephoned Ballow again and was furnished with two other numbers. Calling one of the numbers, the accused was advised that Captain Craig, a lawyer, was not in, but he would return in about fifteen minutes. At the expiration of that period, the accused telephoned again, but Captain Craig had still not returned. The accused left his name and number, with a request that he be called, but no one returned his call. It may fairly be inferred from the accused's testimony that he did not again call any of the three telephone numbers he had, although he used the telephone many times between September 1st and September 5th. On Friday, September 5th, the accused again telephoned Ballow and asked that he and Bolton visit him. Ballow agreed.

Bolton and Ballow arrived at the hospital about 4:00 p.m. After determining from "the medical people" that they could speak to the accused, they went with him to a room "the doctor allowed . . . [them] to use." Following some general conversation about other persons, the agents turned the talk to the Powers killing. Ballow "reminded" the accused about the "similarity" in the method of operation used by the accused in the two robberies he had admitted and the method of operation used by the person who had robbed Powers. He told the accused he now suspected him of murder, and he advised the accused of his right to remain silent and his right to counsel. Asked if he wanted a lawyer, the accused replied: " 'I don't need a lawyer when I talk to you two, I'll need one when I go to trial.' " Essentially, this was the same comment the accused "always" made when advised of his rights at questioning sessions with the agents.

With Bolton taking notes, the accused made an oral statement. The following Monday, September 8th, after again being advised of his rights, which was admitted by the accused at trial, the accused read and signed a written statement in which he admitted, as he had on September 5th, that he had robbed Powers, and Powers was stabbed in the incident. At trial, the accused acknowledged that he had refused the offer of counsel at the September 5th interrogation, but he contended that he did so because he "felt frustrated, it didn't seem like I was going to be able to get any lawyers and nobody trying to help me or nothing, so forget it."

Between trial and this appeal, the accused's contention as to the motivation of the conduct that led to his frustration has changed. At trial, defense counsel argued that Bolton and Ballow "needed a confession" in the Powers case and, therefore, between August 18th and September 5th, they "dilly-dallied" in connection with the accused's efforts to obtain counsel "until they finally frustrated . . . [him] so much that he decided to make a statement." The accused's brief in this Court concedes there is "a lack of evidence indicating . . . denial [of counsel] was purposeful," but he argues that the "effect of the government's course of action during this period of time, was to frustrate . . . [his] attempts to" consult counsel; he maintains that the agents' "judgment" was so clouded by their zeal that they were inattentive to his manifest inability to express himself in the "exact verbal" form and they misconstrued his remarks about counsel. The accused perceives his quoted remarks as "repeated and insisted requests . . . to speak to an attorney."

Whether the conduct of the agents was deliberate or negligent, the accused still regards it as violation of a duty owed him by the agents to insure that he had legal representation. Although not specifically articulated, he apparently conceives the duty as including representation as to the charges for which he was confined as well as

representation for each interrogation by "substitute counsel." For the purposes of this appeal, we need not explore the relationship between "substitute" counsel appointed to represent the accused for a particular investigative proceeding, such as interrogation or a lineup, and counsel appearing generally for the accused in defense against a formal charge; nor, need we consider the effect of that relationship upon a criminal investigator who proposes to interrogate an accused about a different and separate offense. See United States v Estep, 19 USCMA 201, 41 CMR 201 (1970); United States v Bostic, 35 CMR 511 (ABR 1964); Marshall v United States, 436 F2d 155, 160, footnote 18 (CA DC Cir) (1970). The evidence in this case demonstrates that the accused was not in such hopeless or helpless circumstances as to compel the conclusion that his waiver of the right to have counsel at the interrogation on September 5th was involuntary as a matter of law.

Even an accused formally represented by counsel can waive his right to consult counsel, and to have counsel present, at an interrogation. United States v Estep, supra, page 203. The agents testified the accused informed them that he did not need or want a lawyer for the interrogation. The accused admitted he requested the agents to come to the hospital to talk to him, though he knew they were investigating him for "robbery," and, that only a few days before, they had asked him to take a polygraph test in connection with the Powers killing. The accused also admitted that the agents had made telephone calls in his behalf regarding appointment of counsel for him, and that they had provided him with telephone numbers that he could call to obtain more direct information. On August 18th and either on August 27th or 28th, when the polygraph test came up for discussion, the accused's assertion of the right to consult counsel was immediately acknowledged and respected by the agents. Finally, in testimony reserved for mention at this point, the accused indicated that as late as his invitation to the agents to visit him at the hospital on September 5th, he "figured they would tell . . . [him] the truth" about his case because he had no reason to "doubt them." While insisting he was not advised of his rights when the conversation turned to the Powers killing, he admitted he talked with the agents "just like friends. They said what they wanted to say and I said what I wanted to say."

Considering the totality of the evidence, including testimony by a psychiatrist, who had participated in an "intensive" evaluation of the accused, that the accused had the mental capacity to understand the "explanation of . . . [his] rights," there is ample evidence to support a conclusion that he freely, knowingly, and voluntarily waived his right to counsel. Accordingly, we sustain the trial judge's ruling admitting the statement into evidence, and uphold the finding of voluntariness implied in the findings of guilty by the court members. United States v Barksdale, 17 USCMA 500, 505, 38 CMR 298 (1968).

In the second assignment of error, the accused attacks the sufficiency of the trial judge's instructions to the court members regarding the voluntariness of his statement as to the Powers killing. Specifically, he maintains the instructions did not adequately cover his contention that the feeling of frustration induced in him by the Government's disregard of his requests for counsel compelled him to give up his right to counsel at the interrogation. See United States v Tanner, 14 USCMA 447, 451, 34 CMR 227 (1964); United States v Westmore, 17 USCMA 406, 38 CMR 204 (1968).

Proposed instructions were considered by the trial judge and both counsel in an out-of-court hearing. Defense counsel did not object to the instructions on the issue which were proposed by the trial judge, and he made no request for other instructions. However, trial counsel requested a modification on the authority of United States v Bostic, supra, which held that investigative agents had no duty

to inform counsel representing the accused in connection with a charge of robbery, that they were going to question the accused about different and unrelated sex crimes. Defense counsel objected to the requested modification as to the duty of the agents in regard to counsel; he contended that any such instruction would "cloud the issues." The trial judge acknowledged the legal correctness of the rule asserted by trial counsel, but he sustained the defense objection to the request. The instructions given were only those proposed by the trial judge. As they relate to the right to counsel during interrogation and the effect of a denial of the right on the voluntariness of the statement, they are as follows:

"MJ: The court is advised that an issue of voluntariness has been raised by the evidence with respect to Prosecution Exhibits 1, 2, 3, and 4, pretrial statements of the accused. With regard to the contentions of counsel for both sides concerning this issue, you must consider all the facts and circumstances including, but not limited to the evidence presented by the accused; that the questioning which led to the statements took place while he was suspected of an offense and by a person subject to the Uniform Code of Military Justice. . . .

". . . In this connection, the law requires that while he is suspected of an offense, the accused cannot be questioned by persons subject to the Uniform Code of Military Justice, unless he is clearly advised of the nature of the offense of which he is then suspected. . . .

". . . that he has the right to consult with counsel and to have counsel present with him during questioning and that he could retain civilian counsel at his own expense or if he wanted, military counsel would be appointed for him at no expense to himself. This warning is an absolute prerequisite to questioning. No amount of evidence that the accused may have previously been made aware of his rights, will suffice in its stead.

"The law further requires that after being so advised and before making a statement in the absence of counsel, the accused, must first freely, knowingly and intelligently and specifically waive his rights to remain silent and his right to consult with counsel and to have counsel present with him during questioning. A statement obtained from the accused is involuntary and may not be used against him unless the government has proved beyond a reasonable doubt that all of these warnings were given to the accused prior to questioning and before he made a statement in the absence of counsel, he freely, knowingly and intelligently, and specifically waived his rights. . . . In this, as in all other matters, the burden of proof is upon the prosecution, consequently, unless you are satisfied beyond a reasonable doubt that prior to his interrogation, the accused was clearly informed of all his rights I mentioned, and after having been so advised, the accused freely, knowingly and intelligently and specifically waived his rights to remain silent and his right to the assistance and presence of counsel, after the accused indicated his desire to remain silent or to consult with counsel, you must reject the statement as evidence and give it no consideration whatsoever in your deliberations. Those instructions apply to all the four statements."

Without considering the consequences of the change in defense theory between the trial and the appeal, we construe the instructions as directing the court members to determine, specifically and beyond a reasonable doubt, that the accused's waiver of counsel was "freely, knowingly and intelligently" made. The objection to trial counsel's request for clarification of the agents' legal responsibility in connection with conduct that purportedly led to accused's frustration suggests that the defense did not want

any elaboration of specifics because it would include matter unfavorable to the accused's contention. Cf. United States v Bellamy, 15 USCMA 617, 620, 36 CMR 115 (1966). We conclude that the instructions were sufficient to insure consideration of the voluntariness of the statement in light of the special claims of the defense.

The decision of the Court of Military Review is affirmed.

Chief Judge DARDEN and Judge DUNCAN concur.