UNITED STATES, Appellee,

v.

Robert L. QUICK, Private, U. S. Army, Appellant.

No. 31,799.

CM 433570.

U. S. Court of Military Appeals.

May 2, 1977.

*Captain Derryl W. Peden* argued the cause for Appellant, Accused. With him on the brief were *Colonel Alton H. Harvey, Lieutenant Colonel John R. Thornock*, and *Captain John C. Carr.*

*Captain Richard S. Kleager* argued the cause for Appellee, United States. With him on the brief were *Colonel Thomas H. Davis, Lieutenant Colonel Donald W. Hansen*, and *Major John T. Sherwood, Jr.*

Opinion of the Court

COOK, Judge:

The accused seeks reversal of his conviction, of rape and burglary, on the ground the trial judge erred in denying a defense motion to suppress in-court testimony as to accused's identity as the person who committed the offenses, although the judge had ruled inadmissible evidence of a pretrial lineup at which the accused was identified as the criminal.

Government counsel suggest that the trial judge erred in excluding the lineup identification, but they do not frontally challenge the ruling. Nor did the Court of Military Review draw the ruling in question in its own review of the case. While we are not precluded by these factors from examining the matter independently, at least as it bears upon the issue raised by the accused, we think it appropriate to accept the trial ruling as the "law of the case." *See*

*United States v. Starr*, 23 U.S.C.M.A. 584, 586, 50 C.M.R. 849, 851, 1 M.J. 186, 188 (1975).

At the hearing on the defense motion to suppress, evidence was presented as to the manner in which the lineup was conducted. Also, there was evidence of a request by accused for counsel, which allegedly was later revoked. It would have been helpful had the trial judge indicated his reasons for ruling the lineup identification inadmissible, *United States v. Snow*, 157 U.S.App.D.C. 331, 484 F.2d 811, 812 (1973), but as he did not, appellate defense counsel contend that the accused was both deprived of the right to counsel at the lineup and denied due process of law because the lineup was impermissibly suggestive. *See Grande v. General Motors Corp.*, 444 F.2d 1022, 1026 (7th Cir. 1971). A lineup flawed for each of these reasons presents different legal considerations. Improper denial of counsel subjects the lineup identification to an exclusionary rule identical to that applicable to evidence obtained by illegal search, and imposes upon the Government the burden of demonstrating that any in-court identification has "an independent source." *United States v. Wade*, 388 U.S. 218, 242, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).[1] A too-suggestive lineup raises the question whether, considering "the totality of surrounding circumstances," there is "a very substantial likelihood of irreparable misidentification," *Simmons v. United States*, 390 U.S. 377, 383–84, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968), *reaffirmed* in *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Israel v. Odom*, 521 F.2d 1370 (7th Cir. 1975); and there is divided judicial opinion as to the burden of proof. *Sanchell v. Parratt*, 530 F.2d 286, 293 n. 5 (8th Cir. 1976). However, the parties have disregarded the legal differences, and we are impelled to the same result, for the purposes of this appeal, because of the fullness of the evidentiary inquiry conducted by the trial judge and the similarity of factors pertinent to both situations, as evidenced by the following extracts from *Wade, supra*, and *Biggers, supra* :

| United States v. Wade[2] | Neil v. Biggers[3] |
|---|---|
| [Factors considered in determining whether an illegal lineup would taint an in-court identification or constitute an independent source for the latter identification.] | [Factors considered in evaluating the likelihood of an irreparable misidentification where there has been a too-suggestive lineup.] |
| 1. Prior opportunity [of the witness] to observe the alleged criminal act. | 1. The opportunity of the witness to view the criminal at the time of the crime. |
| 2. How long and how well the victim observed the perpetrator of the crime. | 2. The witness' degree of attention. |

1. *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972), determined that constitutionally, the right to counsel attaches "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." As the defendant in that case participated in a lineup that came after arrest, but before any of the enumerated occasions, the Court concluded that he had no right to counsel at the lineup. Government counsel here contend that the right to counsel did not attach, and, therefore, whatever the reason for the absence of counsel that absence did not "alone render the line-up procedure illegal." Our conclusion that the trial judge's ruling represents the "law of the case" requires that we consider all the grounds upon which the ruling could have rested. Consequently, while we acknowledge the substantial nature of the Government's contention, we put it aside for the purposes of this appeal.

2. 388 U.S. at 241 n. 33, 87 S.Ct. 1926.

3. 409 U.S. at 199–200, 93 S.Ct. 375.

3. The existence of any discrepancy between any pre-lineup description and the defendant's actual description.

3. The accuracy of the witness' prior description of the criminal.

4-1. Any identification prior to lineup of another person.

4. The level of certainty demonstrated by the witness at the confrontation.

4-2. The identification by picture of the defendant prior to the lineup.

4-3. The failure to identify the defendant on a prior occasion.

5. The lapse of time between the alleged act and the lineup identification.

5. The length of time between the crime and the confrontation.

Turning to the evidence, it appears that about 10:00 p. m. on Friday night, January 10, 1975, Judith, a specialist four in Medical Company, Martin Army Hospital, Fort Benning, left her second floor apartment in the nurses' quarters to see if a clothes washer in the laundry room was "free" for use. A diagram of the building admitted into evidence indicates that access to the laundry, which was in the basement, was by way of a stairway from a porch that overlooked a parking lot. In the parking lot, Judith noticed a shiny, black automobile that "looked similar" to a Charger. She took note of the car because she wanted to buy a new auto for herself. A black male, wearing a white uniform, was in the vehicle and was visible through an open door. When Judith returned to her apartment she discovered a man in it. She first observed him standing in her apartment-mate's room, at the end of a hallway about 10 feet in length. The hallway had a light, but Judith did not think it was on. However, the passageway was illuminated by the light from a floor lamp in the living room, which was positioned "right near" the open door to the hallway. Judith was in her room, and the overhead light in that room was also on.

Judith watched the man as he traversed the hallway to her room. He wore a white uniform, which she described as "cook's whites" and distinguished it from "medical whites," because it had "snaps," whereas the latter had "buttons." As the man came "inside" her room she saw his face. He remarked: "'I guess I must be in the wrong apartment,'" and Judith responded affirmatively; "that's when he hit" her. She estimated that a "couple of seconds" elapsed between the man's entry into the room and the blow he inflicted upon her.

Judith wore glasses. She thought she was wearing them at the time, but did not know whether they "fell off" when the intruder struck her. We shall say more about the glasses later. Returning to the sequence of events, after striking Judith, the man "got behind" her, put his hand "over . . . [her] mouth," and threw her onto the bed. Then he "picked . . [her] off the bed, . . . walked . . [her] over to the door," shut and locked it, "and turned out the lights." He returned her to the bed, "put pillows over . . . [her] face" and removed part of her clothing. He told her he had a knife and he would kill her if she cried out. Thereupon, he initiated an act of intercourse.

During the sexual act, the man removed the pillows from Judith's face, and told her to kiss him. Judith testified she saw his

face when the pillows were removed. She stated that a "very bright light" entered the room through a space of about 3 inches in the window blinds. The source of the light was a "big street . . . type" overhead light in the courtyard that was affixed to the adjoining building, about 50 or 60 feet away. Judith started to cry. The man recovered her face with the pillows, and she did not see it again.

Concluding his assault, the intruder tied Judith's hands and feet and left, mumbling "something about not trying to get up." When Judith heard the apartment door close, she got out of bed and succeeded in telephoning the military police. Two police officers responded within 5 to 7 minutes. Later Criminal Investigation Division agents arrived. Judith gave them a description of the car she had seen in the parking lot and of the man who had raped her. She described the man as a black male, about 5 feet 7 inches in height, which was about her height, of "stocky build" and a "scroungy" afro hairstyle. She further indicated he was wearing "cook's whites" and combat boots.[4] During questioning by defense counsel, Judith estimated that the "total" time of the two periods during which she saw the face of the intruder was a "minute, maybe slightly more or less."

On the following Tuesday morning, January 14, Judith made a sworn statement to CID Agent Henderson in which she gave essentially the same description of her assailant and the car in the parking lot. Asked whether she would be able to recognize the man if she saw him again, she replied: "I am not positive, but I believe it will all come back to me if I see him again." Later that morning, a car matching the description provided by Judith was located behind a mess hall. The mess sergeant identified the accused as the owner. A license check confirmed the ownership.

The next day the accused participated in a lineup in the dayroom of the CID. Photographs of the lineup were admitted into evidence. These and testimony by Judith and others indicate that five other black men were in the lineup with the accused. All the participants were dressed in civilian clothing. Three of them were over 6 feet in height; one was 5 foot 9 inches, another was 5 foot 10 inches. As noted earlier, the accused was about 5 foot 7 inches. The accused and one other participant wore sneakers; the others were shoeless.

Before appearing at the lineup, Judith had been informed that the CID "had a suspect," but that she was not to " 'get . . . [her] hopes up.' " She asked if the suspect would be in the lineup, and was told " '[t]hat's what we want you to tell us.' " She entered the dayroom from a door at the right of the lineup and moved along the line of men from right to left. As she came to the fifth man, who was the accused, she recognized him as "the same man" that had raped her; he had the "same height and build," "facial description," and his hair was also "the same," a "scroungy" afro.

A CID agent noticed that as soon as Judith saw the accused she "began trembling." Judith testified that as soon as she saw the accused she was "sure" who he was. She had immediate "total recall" of the incident, and she "started crying." Her head began to ache and she became "a little hysterical." She walked out of the room. She maintained that even if she had not seen the accused in the lineup, she would have been able to identify him "in court today."

After Judith left the dayroom, she was escorted to another office. When she had "calmed down," the six men in the original lineup were rearranged in a different order

4. A Government witness testified before the court members that approximately 1 hour before the events in issue, the accused was wearing cook's whites and boots. In their respective arguments, counsel for the parties have interwoven the evidence before the trial judge at the Article 39(a), 10 U.S.C. § 839(a), hearing and the evidence in open court. In our consideration we have limited ourselves to the evidence before the trial judge at the time of his ruling on the motion to suppress. *Cf. United States v. England*, 21 U.S.C.M.A. 88, 89, 44 C.M.R. 142, 143 (1971).

and placed in a room that had a door with a glass part, which was covered by a closed venetian blind. Judith was positioned at the door on the outside of the room, and the blind was opened. Again, she identified the accused as the person who had assaulted her. A third rearrangement of the lineup order produced the same result. At no time was Judith closer to the men in the lineup than 3 to 5 feet.

Evaluating the evidence in light of the criteria enumerated earlier, appellate defense counsel contend that Judith had "very little opportunity to observe her assailant" at the time of the rape, and even in the time she had, her capability of observation was materially diminished because she had the "benefit of her eyeglasses" only for the time before she was struck by the intruder. At the Article 39(a) hearing, when questioned by defense counsel about the effect of the loss of her glasses, Judith had stated that without her glasses she could "[u]sually [see better] up close."

■ According to her testimony, while wearing her glasses, Judith observed the general appearance of the intruder as he walked down the hallway leading to her bedroom, and she saw the clothing he wore, his approximate height and build, the style and kemptness of his hair, and his race. She saw his face for two periods of time during the encounter with him. The first was between the time he entered her room and struck her; the second was during the act of intercourse, when he removed the pillows from her face to get her to kiss him. Judith estimated the time she watched the intruder as he approached her as about 35 to 40 seconds. She calculated that the total time of both intervals when she specifically looked at the man's face was about a "minute, maybe slightly more or less." Appellate defense counsel perceive these intervals for observation as "fleeting." Even such occasions, however, may provide excellent opportunities for observation. The crucial question is not the amount of time involved, but whether the observations of the witness left such "a definite image" imprinted in

her mind of the person to be identified as to enable her to rely upon that image at trial *United States ex rel. Bisordi v. LaVallee,* 461 F.2d 1020, 1024 (2d Cir. 1972).

An unobstructed observation of the perpetrator of a crime of about 2 to 3 seconds was held to be sufficient in *United States v. Bamberger,* 456 F.2d 1119, 1124 (3d Cir. 1972); in *United States v. Mooney,* 417 F.2d 936 (8th Cir. 1969), a 15-second period of observation was held sufficient to provide a substantial independent basis for an in-court identification of the defendant by a witness. While the facts in each case are determinative of the issue, so that previous precedents provide, at best, only guidance, in many respects, *Sanchell v. Parratt, supra,* is so like the present case as to be most persuasive.

In *Sanchell,* a University of Nebraska coed, R, was awakened by a man, who had entered her second floor dormitory room in the early morning between 5:30 and 5:45, when the sun had not yet risen. The room was illuminated either by light from a hallway fixture that came under the door of the room or from light from a floodlight in the courtyard, which entered from under the window drapes. The intruder ordered R not to look at him, but as Judith did in this case, she observed him for two periods of time. Each of these periods lasted about 5 seconds. R was raped. About 12 hours later she helped a police officer prepare a picture of her assailant; another police officer who saw the picture concluded it generally resembled the defendant, whom he knew from an unrelated robbery involving another coed. During the next few days, R told a police officer, she was not sure she would be able to identify the face of the man in her room, however, from a spread of eight photographs, she picked one of the accused and three others as possible suspects. Thereafter, there were two occasions when R viewed the defendant under circumstances that were held to be unnecessarily suggestive. Nevertheless, both the District Court and the Court of Appeals concluded R could properly identify the de-

fendant in court. In pertinent part, the Court of Appeals said:[5]

> Although Renee was also exposed to the suggestive showups, we agree with the district court that there existed sufficient basis for her in-court identification of Sanchell. Renee's opportunity to observe the intruder at the time of the crime was much greater than that of the others and her ability to offer identifying evidence to the police prior to the showups lends credence to her subsequent identification. Prior to the showups, she had chosen Sanchell's picture along with three others and she gave a description sufficient to allow the police to make a composite picture of the suspect. She identified Sanchell the first time she saw him in person. Although the basis of her identification was challenged on cross-examination, under the circumstances we find that her visual identification of the petitioner was admissible, and its credibility was a question for the jury.

As the Supreme Court noted in *Neil v. Biggers, supra*, 409 U.S. at 200–01, 93 S.Ct. 375, a rape victim usually has only a "limited opportunity of observation," but that opportunity can allow her to form a well-defined and lasting image of the rapist in her mind. Here, as the witness in *Biggers*, Judith faced her attacker twice, "directly and intimately." Considering the match-up of her description of him within minutes of the rape with his actual physical characteristics; her reaction on confronting the accused at the initial lineup, which was held only a few days after the act; and the certitude of her identity of him, we are certain of the sufficiency of the evidence to support the trial judge's determination that there was no substantial likelihood of misidentification from too-suggestive pretrial lineups and that there was a source for an in-court identification independent of the lineups.[6] *United States v. Kimbrough*, 528 F.2d 1242, 1244–47 (7th Cir. 1976).

The decision of the Court of Military Review is affirmed.

Judge PERRY concurs.

FLETCHER, Chief Judge (concurring in the result):

I concur in the result because I am satisfied that the standards enunciated in *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), were met.

---

5. *Sanchell v. Parratt*, 530 F.2d 286, 297 (8th Cir. 1976).

6. Appellate defense counsel contend there is an "obvious . . . serious discrepancy" in Judith's description of her assailant. The alleged discrepancy is that in her pretrial written statement Judith indicated her attacker had a "Northern accent," but say counsel, "the appellant is a Southerner." At trial, Judith explained that by a Northern accent she meant "[s]omething other than a very deep Southern accent"; and a CID agent testified she had told him her attacker had "a sort of Southern accent." More importantly, Judith identified the accused solely by his appearance, not his voice, and that identification was well-founded. *Cf. Sanchell v. Parratt, supra* at 295, 297.