UNITED STATES, Appellee

v

BOBBY J. HOWARD, Private,
U. S. Army, Appellant

18 USCMA 252, 39 CMR 252

No. 21,469

April 18, 1969

*Major Dennis R. Hunt* argued the cause for Appellant, Accused. With him on the brief were *Colonel Daniel T. Ghent, Captain Stephen Arinson,* and *Captain Anthony F. Cilluffo.*

*Captain Edwin L. Gage* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel David Rarick, Major Edwin P. Wasinger,* and *Captain Joel P. Schiff.*

## Opinion of the Court

QUINN, Chief Judge:

The accused seeks reversal of his conviction for robbery on the ground that certain instructions by the law officer as to the voluntariness of a pretrial statement admitted in evidence against him were prejudicially deficient and erroneous.

Two soldiers were at a hitchhiking stop at Fort Gordon, Georgia. They were approached by three other servicemen; one of the latter drew a small revolver, the other brandished a switchblade knife, and the third, the accused, stood at the side with a small pocket knife in his hand. On demand, the soldiers turned over their money and a lighter to the robbers, who then fled. A short time later, two of the suspects

**253**

were apprehended by Military Policemen. One of them "provided" the name of the accused as the third man. Agent Bobby W. Moore, Criminal Investigations Detachment, picked up the accused and brought him to the CID office for questioning. The interrogation was conducted in Moore's office with his "partner," Agent Garfield T. Roberts, seated at his desk about five feet away.

At trial, Moore and Roberts testified that the accused was advised he was a suspect in a robbery at the bus stop, and that he was fully informed of his right to remain silent and right to a lawyer during interrogation. In addition, the accused signed a document containing an enumeration of his rights, including the right to "stop answering questions at any time," and he initialled two separate lines on the writing indicating he did not want counsel and that he gave his "consent to being questioned." The accused, however, testified that he said to Moore, who initiated the questioning, " 'Yes, I guess I'll be needing one' " (meaning a lawyer), but Moore acted "[l]ike he didn't hear" him and continued the interrogation. He also testified that, while Moore did not appear to be "angry," he "wasn't friendly" and was "bullying" so that the accused wasn't "getting along with him." After a time, he said to Moore: " 'No, I don't want to talk to you.' " At that point, the accused felt that "the questioning . . . was over," but Roberts then engaged him in conversation, which started with talk about his hometown and within "[p]ossibly five minutes" concluded with a statement about the offense, which was typed by Roberts and signed by him. The accused admitted Moore never shouted at him; never threatened to strike or use any other force against him; and that it just seemed that Moore "had sort of a bad attitude towards" him.

Moore testified he did not bully or otherwise intimidate the accused. He admitted there was an apparent personality clash between them, which he attributed to the fact that he was Negro and the accused was Caucasian. He testified the accused maintained only that he would not talk to him, but would talk to Roberts. Roberts corroborated

Moore. He testified that when he observed the obvious "conflict of personality" between Moore and the accused, he "moved . . . [his] chair over" and started to talk to the accused. He asked the accused if he wanted to tell him about the offense, and the accused replied, " 'I'll tell you but I won't tell him.' " Moore got up and left the room. Both Moore and Roberts denied that the accused said he would need a lawyer; they maintained if he had said that they would have suspended the interrogation to allow him to obtain counsel.

Overruling a defense objection, the law officer admitted the accused's statement in evidence. He immediately informed the court members that his ruling merely placed the document in evidence, and he instructed them as follows:

". . . [E]ach court member will independently determine, based upon the evidence, whether or not the statement is voluntary or involuntary. If you determine it is involuntary, you will reject it; if you determine it is voluntary, of course you may accept it on certain rules that I will give you later on and I will give you some lengthy instructions with regard to this at the conclusion of the case."

Later, in his final instructions, he referred to his ruling and instructed the court members as follows:

"Now with regard to the Prosecution Exhibit 1, the out-of-court statement of the accused, you are advised my ruling in receiving this out-of-court statement in evidence is final only on the question of admissibility. My ruling merely places the statement before the court. It does not establish the voluntary nature of the statement. Each of you, in your deliberations on the findings of guilt or innocence, may come to your own conclusion as to the voluntary nature of the statement. You may accept the statement as evidence only if you determine beyond a reasonable doubt that it was voluntary. If you do not determine that the statement was voluntary, you must reject it and disregard it as evidence in the case. You are also advised that any evi-

dence adduced as to the voluntary or involuntary nature of the accused's out-of-court statement may be considered by you in determining the weight that you will give to the statement. You are further advised in this connection that this out-of-court statement of the accused is not voluntary if it was obtained from the accused by the use of coercion, unlawful influence or inducement. Actually, we don't have any issue as to coercion, unlawful influence or unlawful inducement, but we do have an issue as to whether or not the accused told the CID Agent, or requested of the CID Agent that counsel be appointed for him. As a matter of fact, as I recall, the accused's words in this regard, when asked if he wanted a lawyer by the CID Agent, his words were: Yes, I guess I'll be needing a lawyer or words to that effect. And the other issue is after the interrogation or interview had been going on for a little while the accused states that he said he didn't want to talk about the offense any more. Now if the accused requested a lawyer and a CID Agent continued the interrogation without granting a lawyer, then you may consider that the statement is not voluntary. The same thing is true if the accused said he didn't want to talk about the offense any more, or didn't want to talk to the CID Agent any more and they continued to interrogate him, then anything he said following his request for termination of the interview, to cease, you may then determine that the balance of the statement is not voluntary, and you may reject it. Put in another way, you may also consider the statement is not voluntary if it was obtained from him through the interrogation of a person subject to the Uniform Code of Military Justice who did not first inform the accused of the nature of the accusation and advise him he did not have to make any statement regarding the offense of which he was accused or suspected, and that any statement made by him might be used as evidence against him in a trial by court-martial, and further, that he had a right to consult with and have with him during interrogation an attorney provided by him or an attorney appointed for him, and, further, if the statement was taken at an interrogation without the presence of counsel, that the accused freely, knowingly and intelligently and affirmatively waived his right to counsel and remained silent. As I say, the burden is on the government to prove beyond a reasonable doubt that the CID Agents did not continue with the interrogation of the accused following any statement by the accused, if such was made, that he requested counsel or he didn't want to talk further about the case."

When the voluntariness of a pretrial statement by the accused is in issue, the court-martial must be ▮▮▮▮▮▮ ▮ instructed that if it has a reasonable doubt as to voluntariness of the statement, it "must . . . reject . . . [it] in toto." United States v Jones, 7 USCMA 623, 627, 23 CMR 87. Appellate defense counsel concede that parts of the quoted instructions meet this requirement. Indeed, the court members were twice instructed they must reject the statement, unless they determined beyond a reasonable doubt that it was voluntary. However, counsel contend that the repeated use of the word "may," instead of "must," in the middle part of the instructions presented a fair risk that the court members might have mistakenly concluded they had discretion to consider the statement even if they did not determine it was voluntary. See United States v Bruce, 9 USCMA 362, 364, 26 CMR 142. They further argue that the instructions were inconsistent, and it cannot fairly be determined which instruction the court members followed, with the result that reversal is required. See United States v Noe, 7 USCMA 408, 22 CMR 198. We read the instructions differently.

The first part of the instructions directly and expressly admonished the court members that each ▮▮▮▮▮▮ ▮ had to determine beyond a reasonable doubt that the statement was voluntary; and if he did not so find, he "must reject it and disregard it as evidence in the case." Then, the law officer reviewed evidence

of the circumstances which could affect the voluntariness of the statement, despite complete preliminary advice as to the right to remain silent and the right to counsel. The reference to each item of evidence was prefaced or ended with a variant of the phrase "then you may consider that the statement is not voluntary." The law officer's final statement was a reminder that the burden of proof was on the Government to establish beyond a reasonable doubt that none of the circumstances was actually present when the accused made his statement. The instructional pattern convinces us each court member understood that, if he was not satisfied beyond a reasonable doubt that none of the circumstances enumerated by the law officer were present, the statement was involuntary and had to be disregarded as evidence against the accused. We are not persuaded that each sentence should be isolated and separately assessed as to its impact on the court members. Conceptually, the instructions were unified, and they should be read together as the court members and counsel heard them. United States v Smith, 8 USCMA 582, 25 CMR 86; United States v Merrow, 14 USCMA 265, 34 CMR 45; Suggs v United States, — F2d — (CA DC Cir) (1969). The Suggs case caution against the "supercritical scrutiny" of instructions by appellate courts is especially apposite, and merits reiteration here:

"It is not difficult of course to isolate an individual sentence in a series of jury instructions thereby highlighting its special meaning and obscuring the collective impact of the jury instructions taken as a whole. Such an approach, however, tends to focus on the trees and misses the forest. Nor can we accept the notion that jurors give instructions the supercritical scrutiny which an appellate court can provide. We are satisfied that considered as a whole, rather than dealing with parts taken out of context, the charge abundantly covered the essential elements." [Id., at page —.]

Approaching the instructions from another standpoint, appellate defense counsel contend the law officer erred in declaring the evidence presented no issue of "coercion, unlawful influence or unlawful inducement." They discern psychological coercion in evidence they view as indicating utilization of a "Mutt and Jeff" technique to get the accused to talk. According to their construction of the evidence, Moore was Mutt, the "relentless investigator," and Roberts was Jeff, the "kindhearted" person, who disapproved of Mutt and his hardheartedness. See Miranda v Arizona, 384 US 436, 452, 16 L Ed 2d 694, 86 S Ct 1602 (1966). The short answer to this contention is that all the testimony, including the accused's, is to the effect that, after being fully advised of his right to say nothing and to consult counsel, the accused freely consented to speak without the assistance of counsel. Initially, therefore, Moore's unfriendliness and Robert's kindliness had absolutely no effect upon the accused's decision to speak. As we shall observe later, he did, in fact, talk about some aspects of the offense before any difference between Moore and Roberts was apparent to him. Eventually, the accused reached a point in the questioning when, depending upon whether the court members believed him or the agents, he either refused to talk completely or he was willing to talk only to Roberts. If the accused was believed, continuation of the interrogation was improper, and the statement was inadmissible without regard to the techniques used by the agents to continue the questioning. United States v Bollons, 17 USCMA 253, 38 CMR 51. On the other hand, if the agents were believed, the accused was patently not persuaded to change from silence to speech by the agents' technique, but merely to address himself to one of the agents in preference to the other. Neither alternative involved psychological pressure to influence the accused to choose speech over silence. We conclude, therefore, that even construing the evidence as sufficient to indicate utilization of a technique stressing differences in personality and attitude between the agents, none of the evidence raised an issue of coercion or cajolement of the accused to waive his right to remain silent or to terminate the in-

terrogation whenever he wished. We find no merit, therefore, in this challenge to the instructions.

Although no mention of the matter appears in the transcript of the out-of-court hearing on the instructions, appellate defense counsel contend that the instructions are materially deficient because they do not include the "factual question . . . of whether Agent Moore's subsequent statement" to the accused "vitiated the prior Article 31 warning." The argument is predicated upon the following testimony by the accused in open court:

"Q. What, if any, threats did the CID investigator make against you concerning your decision whether to make a statement?

"A. He told me I could be in a mess of trouble for not telling him I had that knife, you know; he said I'd be in just as much trouble with that.

"Q. Did he indicate you'd be in trouble if you didn't tell what you knew?

"A. Yes, he did."

Appellate defense counsel view this testimony as indicating that Moore's statement to the accused undermined his earlier advice regarding the right to remain silent. They see a parallel between what happened here and what occurred in United States v Dalrymple, 14 USCMA 307, 34 CMR 87, and United States v Green, 15 USCMA 300, 35 CMR 272.

Neither *Dalrymple* nor *Green* is directly in point. In *Dalrymple*, there was evidence to indicate that the agent told the accused any statement he made would not be used against him. We held this evidence presented a question of fact as to whether the accused was improperly influenced to choose speech over silence. In *Green*, there was evidence which could be construed as indicating the agents led the accused to believe they could confer privately in confidence and without police interference; the Court held that this evidence raised a factual question for the court-martial's determination as to whether the accused were improperly induced to speak rather than to continue to rely upon their right to remain silent. Both cases involved a promise of confidentiality which, if believed, could have been considered an improper inducement to the accused to speak; consequently, there was an issue affecting the voluntariness of the pretrial statements, notwithstanding the accused had been preliminarily advised of their right to remain silent. No hint of confidentiality is suggested in this case by either defense counsel's questions or the accused's answers. That circumstance, therefore, is not present. The cited cases, however, have relevance to this appeal insofar as they stand for the principle that actions by an agent subsequent to advising the accused of his rights may indicate coercion or improper inducement sufficient to impair the accused's freedom of choice between speech and silence. In his questions, defense counsel here used the words "threats" and "trouble." Undeniably, therefore, the questions were calculated to elicit testimony as to coercion; but whether coercion appears in the accused's answers is a different matter.

Considered literally, the accused's answers imply that Moore told the accused what the police knew about his participation in the offense. So construed, there is no coercion. When an accused has been advised of his rights and has clearly indicated he understands his rights and is willing to answer questions, it is patently not coercion within the meaning of Article 31 to advise him of the available evidence against him. The accused's testimony in the out-of-court hearing on the admissibility of his statement casts Moore's remarks in a different light. Since that testimony was not before the court members and could not, therefore, be submitted to them for consideration, it ought not be available to the accused on this appeal. See United States v Dicario, 8 USCMA 353, 24 CMR 163. However, even if we stretch the accused's trial testimony into the contours of his testimony in the out-of-court hearing, there is still no evidence of coercion. Before the law officer, the accused testified as follows:

"Q. What, if any, threats did investigator Moore make against you con-

cerning your decision whether or not to make a statement?

"A. He asked me if I knowed they had that knife and gun. I said yes.

"TC: I'm sorry. Could you speak a little louder?

"A. He asked me if I knowed they had the gun and knife and I said yes. He said, well, if you don't tell me the story, he says you'll be in as much trouble for not turning it in to somebody.

"Q. From that did you imply or did he do anything that would cause you to imply that you wouldn't be in as much trouble if you did tell them what you knew?

"A. I said I'd be in just as much trouble . . .

"Q. That's what he said?

"A. (Witness nods affirmatively.)

"Q. Did you think you'd be in as much trouble if you did tell them, as if you just kept quiet?

"A. I didn't know."

It is apparent that the accused and Moore had discussed some aspects of the offense before Moore ▌ made the remarks attributed to him. The nature of the discussion can be gleaned from other testimony and inferences inherent in the accused's testimony. Moore testified the accused had denied he was involved. From the accused's testimony, it may be inferred he admitted he knew his companions had the "knife and gun" in their possession when the robbery was committed. It will also be recalled that one of the robbers had talked to CID agents, and it may be fairly inferred that he had identified the accused as the third man in the trio of robbers. It is not at all surprising, therefore, that absent an innocent explanation of his presence at the scene, the accused was indeed "in as much trouble" as the others. Moore's remarks, therefore, were legally sound and factually correct. In our opinion, it is not coercion within the meaning of Article 31 for an agent to tell an accused, who has consented to interrogation, of the probable legal consequences

of the information known to the police. We conclude, therefore, that there was no evidence justifying an instruction of the kind advocated by appellate defense counsel.

The decision of the board of review is affirmed.

Judge DARDEN concurs.

FERGUSON, Judge (dissenting):

I dissent.

We granted review in this case to determine whether the law officer's instructions on voluntariness with regard to the out-of-court statement of the accused were prejudicially deficient and erroneous. For the reasons stated in their opinion, my brothers believe they were not. I disagree.

I believe my brothers too lightly regard the specific injunction of the Supreme Court in Miranda v Arizona, 384 US 436, 475, 16 L Ed 2d 694, 724, 86 S Ct 1602 (1966), that:

"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. Escobedo v Illinois, 378 US 478, 490, note 14, 12 L Ed 2d 977, 986, 84 S Ct 1758. This Court has always set high standards of proof for the waiver of constitutional rights, Johnson v Zerbst, 304 US 458, 82 L Ed 1461, 58 S Ct 1019, 146 ALR 357 (1938). . . ."

It is clear from the above quotation that if a statement is secured without the presence of an attorney, an issue of waiver is immediately raised by that fact alone and the Government bears the burden of demonstrating that the accused *knowingly and intelligently waived* his privilege against self-incrimination and his right to retained or appointed counsel. I have thoroughly reviewed the law officer's instructions with regard to the accused's pretrial statement and I am unable to find where he specifically so informed the court. His failure to do so is, in my view,

prejudicial error. Miranda v Arizona, supra.

In the case at bar, as my brothers correctly acknowledge and as the law officer instructed, there was conflicting testimony as to whether the accused, after being warned of his right to remain silent and his right to a lawyer during the interrogation, elected to proceed without benefit of the presence of an attorney. The instructions of the law officer to the court that if they found that "the accused requested a lawyer and a CID Agent continued the interrogation without granting a lawyer, then you *may* consider that the statement is not voluntary" (emphasis supplied) is in direct contravention of the Supreme Court's holding in *Miranda* that:

". . . If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation *must* cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; *any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise."* [*Ibid.*, at pages 473, 474.] [Emphasis supplied.]

So, too, the law officer's instruction to the court that:

". . . if the accused said he didn't want to talk about the offense any more, or didn't want to talk to the CID Agent any more and they continued to interrogate him, then anything he said following his request for termination of the interview, to cease, you *may* then determine that the balance of the statement is not voluntary, and you *may* reject it." [Emphasis supplied.]

Information obtained under those circumstances *must* be rejected. As the Court said in *Miranda:*

". . . Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." [*Ibid.*, at page 474.]

The majority hold that the doctrine of the instructions as a whole should apply, since the court was initially instructed that they must reject the statement unless they found it was voluntarily given and that the burden is upon the Government to establish beyond a reasonable doubt that none of the circumstances of involuntariness were present when the accused made his statement. I do not comprehend how they can take this position in view of the clear error by the law officer in delineating the standards by which voluntariness is to be measured. Miranda v Arizona, supra. At the very least, as appellate defense counsel contend, where the instructions are inconsistent and it cannot fairly be determined which instruction the court members followed, the instruction as a whole test is inapplicable. United States v Morphis, 7 USCMA 748, 23 CMR 212; United States v Noe, 7 USCMA 408, 22 CMR 198.

My brothers likewise reject error by the law officer when he told the court:

". . . You are further advised in this connection that this out-of-court statement of the accused is not voluntary if it was obtained from the accused by the use of coercion, unlawful influence or inducement. *Actually, we don't have any issue as to coercion, unlawful influence or unlawful inducement,* but we do have an issue as to whether or not the accused told the CID Agent, or requested of the CID Agent that counsel be appointed for him." [Emphasis supplied.]

The Government's own evidence revealed that the "Mutt and Jeff" technique, identified in *Miranda* as a form of psychological coercion, was successfully utilized by the interrogators in their interview of the accused. (*Ibid.*, at pages 448–455.) Agent Moore was Mutt, the "relentless investigator," and Agent Roberts was Jeff, the "kindhearted man," who disapproved of Mutt and his hardheartedness. (*Ibid.*, at page 452.) Because of Moore's tactics, the accused refused to speak further with him. At that point he felt the questioning was over, but Roberts them engaged him in conversation, which

started with talk about Howard's hometown and concluded with a statement about the offense, which was typed by Roberts and signed by the accused. In speaking of this and other methods of interrogation, the Court, in *Miranda*, said:

". . . we stress that the modern practice of in-custody interrogation is psychologically rather than physically oriented. As we have stated before, 'Since Chambers v Florida, 309 US 227 (84 L Ed 716, 60 S Ct 472), this Court has recognized that *coercion* can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition.' Blackburn v Alabama, 361 US 199, 206, 4 L Ed 2d 242, 247, 80 S Ct 274 (1960)." [*Ibid.*, at page 448.] [Emphasis supplied.]

My brothers do not believe that the utilization of the technique raises an issue of coercion or cajolement. I disagree. *Miranda* so categorizes it. But, in any event, it was a matter that should have been submitted to the court for its determination. United States v Askew, 14 USCMA 257, 34 CMR 37; United States v Houston, 15 USCMA 239, 35 CMR 211. The law officer's instruction that there was *no* evidence of coercion, unlawful influence or unlawful inducement, was patently erroneous. Miranda v Arizona, supra.

An out-of-court statement may not be considered as evidence against an accused unless it was voluntarily given. Manual for Courts-Martial, United States, 1951, paragraph 140a. See also United States v Smith, 13 USCMA 105, 32 CMR 105. In the early case of United States v Monge, 1 USCMA 95, 98, 2 CMR 1, we said:

". . . Basically, the question is whether the accused possessed, at the time of the confession, 'mental freedom' to confess or deny participation in the crime. Lyons v Oklahoma, 322 US 596, 602, 88 L Ed 1481, 1484, 64 S Ct 1208."

Most recently in United States v Westmore, 17 USCMA 406, 410–411, 38 CMR 204, we stated:

"Voluntariness is a factual question and, like all factual questions, must be proved beyond a reasonable doubt; *so, too, all the issues which go to the determination of voluntariness.* United States v Jones, 7 USCMA 623, 23 CMR 87; United States v Acfalle [12 USCMA 465, 31 CMR 51] and United States v Odenweller . . . [13 USCMA 71, 32 CMR 71]." [Emphasis supplied.]

And in United States v Tanner, 14 USCMA 447, 451, 34 CMR 227:

". . . what is required in every case, as we have on many occasions reiterated, is a meaningful submission of the interrelationship between the evidence and the law to the court-martial. United States v Askew; United States v Smith; United States v Acfalle, all supra."

In light of the above, I would hold that the law officer's instructions on voluntariness were prejudicially deficient and erroneous. I would reverse the decision of the board of review.