UNITED STATES, Appellee

v

ALBERT JOSEPH GIRARD, Jr., Specialist Four, U. S. Army,
Appellant

No. 28,152

January 10, 1975

*Richard T. Simmons, Esquire,* argued the cause for Appellant, Accused. With him on the brief were *Colonel Arnold I. Melnick, Colonel Victor A. DeFiori, Captain Gilbert J. Weller, Captain John T. Willis,* and *Captain Richard E. Schmidt.*

*Captain Gregory M. VanDoren* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Ronald M. Holdaway, Lieutenant Colonel Donald W. Hansen,* and *Captain David A. Schlueter.*

## OPINION OF THE COURT

QUINN, Judge:

An interrogation by a Criminal Investigations Detachment agent, almost all of whose testimony regarding the interrogation was called a "lie" by the accused, and a finding implicit in a ruling by the trial judge that the accused was the liar, provide the occasion for this appeal from a conviction for wrongful sale of heroin.

No evidence as to the interrogation was introduced as part of the Government's case in chief. Agent Robinson, who conducted the interrogation, testified only that, on November 11, 1972, operating undercover at Fort Bragg, North Carolina, he bought $20 of heroin from the accused at the parking lot of the accused's company. On November 16, he arrested the accused for that sale. In defense, the accused testified that he did not sell the heroin. He maintained that, responding to Robinson's request for drugs, he told Robinson he knew "somebody in the company who might have some."[1] He went into the barracks where he met Abbott, who worked with him in the company and had "repeatedly tried to sell" him drugs.[2] He told Abbott

about Robinson. Abbott gave him a packet, which he said contained heroin, and told him to give it to Robinson. He did as requested and received $20 from Robinson. Immediately, he returned to the barracks and gave all the money to Abbott. Additionally, the accused testified that he had never "been involved in anything like this," and he had never received drugs "from anyone else."

Substantial parts of the accused's testimony were inconsistent with statements he made when questioned by Agent Robinson at the CID office after his arrest. Among other things, the accused had then represented that he had obtained the heroin from a "guy . . . he didn't know" and could not describe or identify, except that he was "down in the 82d."[3] The accused further admitted he had "sold this particular heroin" because he was "low on money and . . . planned on getting married."

At an out-of-court hearing before the judge to consider the admissibility of the pretrial statements as rebuttal evidence for the Government, Robinson testified that before questioning the accused, he informed him of his rights by reading them to him verbatim from a card he carried.[4] The card was identified and

---

[1] The accused gave two reasons for his action. The "only reason" was that Robinson appeared to be "high" or "sick," and he "felt sorry for the guy," although he was a "total stranger." Secondly, he had seen persons in "withdrawals" and as Robinson possessed a stick about 2½ to 3 feet in length and 1 to 1½ inches in thickness, he was "kind of scared," not knowing what Robinson was "going to do."

[2] Purportedly, Abbott was discharged "right after" the accused was confined.

[3] The reference appears to be to the 82d Airborne Division, a unit stationed at Fort Bragg. That fact and the inference that the accused's company was not part of the 82d Airborne Division would have been known to all the participants in the trial, which was held at Fort Bragg. United States v Jones, 2 USCMA 80, 6 CMR 80 (1952).

[4] The testimony at this hearing is different from later testimony before the court members. However, the parties have intermingled all the testimony in their briefs and argument, and we will

admitted in evidence as Prosecution Exhibit 3.[5] Agent Harrell, Robinson's supervisor, corroborated this testimony. We set out the remainder of the Government's evidence on this issue as it may have been found by the trial judge and the court members.

After reading the statement of rights from the card, Robinson "explained" to the accused that counsel meant a lawyer; the accused indicated he understood and that he did not want counsel. Referring to the right to remain silent, Robinson advised the accused that anything he said "could be held against him." Then Robinson spelled out two ways in which the accused could speak. First, the accused could make "a witness statement," which meant that Robinson would ask questions, the accused would answer, and all the questions and answers would be "typed up," and the accused "would have to sign" and swear to the statement. The accused refused to make that kind of statement. Robinson thereupon referred to the second way in which the accused could speak; this way was that Robinson would ask questions and the accused could answer, but neither the questions nor answers would be reduced to writing, and the answers would not be sworn to by the accused. Robinson asked the accused then if he "would consent to being questioned and answer questions;" the accused replied: "I'll answer some of your questions, depending upon what they are."

The accused took the stand three times to testify to the circumstances of the interrogation. In substance, he stated he was not told he had a right to counsel and, although he knew he had a right to remain silent, he was not so informed by Robinson.[6] He further maintained he told Robinson he would not "make any kind of statement" and, in fact, he did not say anything at the interrogation. He insisted that "all" of Robinson's and Harrell's testimony was "a lie."

Over defense objection, the statements were admitted in evidence for the limited purpose of impeaching accused's credibility as to his version of the drug transaction. Later, the judge instructed the court members on the subject. Among other things, he indicated that each member had to determine beyond a reasonable doubt whether the accused "made any statement;" if each member did not so find, the testimony of the agents "on this" had to be disregarded in the member's deliberations on the ac-

---

treat it the same way for the purposes of this appeal. United States v England, 21 USCMA 88, 44 CMR 142 (1971).

[5] The information read to the accused, which appeared on both sides of the card, was as follows:

FRONT OF THE CARD FOLLOWS:
THE WARNING

"Before I ask you any questions, you must understand your rights.

1. You have the right to remain silent.

2. Any statement you may make may be used as evidence against you in a criminal trial.

3. You have the right to consult with counsel and to have counsel present with you during questioning. You may retain counsel at your own expense or counsel will be appointed for you at no expense to you. If you are subject to the Uniform Code of Military Justice, appointed counsel may be military counsel of your own selection if he is reasonably available.

4. Even if you consent to being questioned now without having counsel present, you may stop answering questions at any time. Also, you may request counsel at any time during questioning."

BACK OF THE CARD FOLLOWS:
THE WAIVER

After this warning is given, ascertain whether the accused or suspect understands his rights and will be able to freely, knowingly, and intelligently waive them. If he does so understand his rights, then specifically ask him these two questions:

"1. Do you want counsel?

2. Do you consent to being questioned?"

If the accused or suspect indicates that he wishes to consult with counsel, do not question him until counsel is obtained. Likewise, if the accused or suspect indicates he does not wish to be questioned and he has no counsel present, do not question him.

ARMY-FT RILEY, KANS S-9679

[6] During the defense case in chief, the accused had testified that at the time of his apprehension "they advised me of my rights."

cused's guilt. Enumerating the standard requirements of advice to an accused at a police interrogation, he further instructed that each member must find beyond a reasonable doubt that the accused freely and intelligently waived the right to counsel and the right to remain silent.

■ In *Harris v New York,* 401 US 222 (1971), the United States Supreme Court held that the Government could not use as part of its case in chief a statement obtained from an accused who had been given defective advice as to his rights at a custodial interrogation, but it could use such statement to impeach the accused's credibility. Military law provides, however, that a deficient advice bars use of a statement even for impeachment. Manual for Courts-Martial, United States, 1969 (Rev), paragraphs 140*a*(2) and 153*b; United States v Jordan,* 20 USCMA 614, 44 CMR 44 (1971). Consequently, the adequacy of the advice given the accused is still open to review.

### THE CLAIM THAT ACCUSED'S ATTEMPT TO EXERCISE THE RIGHT TO REMAIN SILENT WAS "FRUSTRATED"

■ Appellate defense counsel raise an issue preliminary to the adequacy of Agent Robinson's advice. They contend the record demonstrates that the accused had elected to remain silent, but "continued questioning" by Agent Robinson "frustrated" his efforts. See *United States v Bollons,* 17 USCMA 253, 38 CMR 51 (1967). Considering the accused's repeated representation that he not only asserted the right to remain silent, but, in fact, did remain silent, it is difficult to follow counsel's argument. The trial judge noted, both at the out-of-court hearing and in his instructions to the court members, that the major conflict between the accused and the agents was whether the accused said anything at all. If the accused said nothing, as he testified, he certainly was not frustrated in his assertion of the right to remain

silent. The accused's contention of total silence was unmistakable and unavoidable. Since the judge ruled against the accused, he implicitly found that the agents had testified truthfully on this point, and the accused did not. Ample testimony, if believed, supports the finding. We perceive nothing in the record to justify disregard of that testimony, and we conclude that this aspect of the accused's present claim of error lacks merit.

### THE CONTENTION THAT ACCUSED WAS "NOT ADEQUATELY" ADVISED ABOUT HIS RIGHT TO REMAIN SILENT

Earlier, we noted that Robinson, corroborated in material part by Harrell, testified he read the accused's rights to him from a card. The card mentioned the right to remain silent, and contained a warning that any statement made by the accused "may be used as evidence against . . . [him] in a criminal trial." The accused disputed much of this testimony. We need not itemize all the differences. So far as the accused's testimony bears on the specific ground of the present challenge to the trial judge's ruling on admissibility, suffice it to note the accused conceded that Robinson read his rights to him from a card. However, the accused maintained that he did "not really" understand them because Robinson read "them real fast" and did not explain them.[7] Alternatively, he maintained he was not, in fact, advised of his right to counsel, and, while he knew he had a right to remain silent, he was not so informed at the interrogation.

■ What emerges from the record is a direct conflict of credibility. Appellate defense counsel contend Robinson's testimony is confusing and, in one substantial particular, contradictory, at least in its "import." Robinson's testimony, however, was corroborated in substantial part by Harrell. The testimony of both is not so inherently improbable or uncertain as to be entitled to little or no

---

[7] Robinson disputed the accused's version of the reading. He testified he "completely read" the card at a speed and in a tone of voice that he demonstrated. Neither the tone nor the speed was de-

scribed in the record, but it may be fairly inferred that the reading was clearly audible and the rate of speed was such as to allow a listener to comprehend the content.

consideration as a matter of law. On the other hand, the accused's testimony contains substantial inconsistencies that are conducive to disbelief of his assertions. The conflict in testimony on this point is like the conflict as to whether the accused spoke at all. If believed, a sufficient quantum of the evidence supports the trial judge's determination that the accused had been adequately informed of his right to remain silent and of the consequence of his choosing to speak. Consequently, this aspect of the accused's attack on the judge's ruling also lacks merit.

## ACCUSED'S CONTENTION THAT HE WAS MISLED INTO BELIEVING THAT ONLY WRITTEN STATEMENTS COULD BE USED AGAINST HIM

The formula of advice to an accused at a stationhouse interrogation is not restricted to particular words in a particular sequence. In a given case, especially if the accused appears to have limited experience and education, an explanation of the rights that will aid accused's understanding is appropriate. For example, to a young and unwordly person, the word "counsel" may not be as well-known and understood as the word "lawyer." Yet, emendations present a risk. An otherwise correct advice may be negated by supplemental information provided by the police officer which "impair[s] the accused's freedom of choice between speech and silence." *United States v Howard*, 18 USCMA 252, 257, 39 CMR 252, 257 (1969). Piecing together various parts of the evidence, appellate defense counsel present a picture which they contend portrays Robinson as having "disastrously misled appellant into believing that only a 'written statement' could be used against him."

Detailing the evidence earlier, we set out a version of the interrogation that the trial judge and the court members could have found. Some of Robinson's testimony is not clear. The trial judge commented on that in his instructions by observing that the testimony as to "written or oral statements" was not "a model of clarity."[8]

Robinson left no doubt he was convinced his supplemental advice could not have led the accused to believe that if he elected to answer questions, only the witness-type statement could be used against him. Robinson's certitude, of course, does not demonstrate the accused's understanding of the matter. See *United States v Dicario,* 8 USCMA 353, 24 CMR 163 (1957). Alluding to the accused's youth, his limited education, and general inexperience, appellate defense counsel contend that the accused could not have followed the subleties of Robinson's advice.[9] From either of two points of view, the contention is not persuasive.

First, the accused had three opportunities to testify to his understanding of the advice. At no time did he testify categorically that as a result of what Robinson told him he believed if he made only an oral statement, the statement could not be used against him. Nor can we imply such belief from what he did say. First and foremost, he maintained he did not make any statement at all, written or oral; secondly, he admitted that Robinson read his rights but, while he did not "really" hear them, the reading did not include advice as to the right to remain silent; thirdly, that everything Robinson had testified to was "a lie." None of this imports a belief or understanding that a written statement could be used against him, but an oral statement could not. The only references to written or oral statements appear in four questions asked him in his last appearance on the stand and his negative answers thereto; these also do not, in our opinion, import any claim that the accused was misled as to the kind of statement that could be used against him if he elected to speak.[10]

---

[8] The difficulty was attributed to Robinson's "inarticulatness (sic) or his confusion."

[9] Government counsel posit a different picture of the accused's education and experience.

[10] DC: Did he [Robinson] ever differen-

tiate for you the difference between an oral statement and a written statement?
A: No, sir, he did not.

MJ: Did you know if you did say anything to them, by written statement or by answering their questions, and any-

Secondly, assuming we read the accused's testimony too narrowly, the version of the supplemental advice testified to by Robinson and Harrell would not have misled a person of ordinary intelligence. The accused's testimony and the testimony about him indicate he is at least such a person. Consequently, this aspect of the accused's assignment of error presents the same conflict in credibility apparent in the other aspects of the assignment. In ruling against the accused, the trial judge obviously resolved the conflict against him. Substantial evidence supports his finding. Further, the judge's instructions to the court members focus directly on the issue.[11] We cannot say as a matter of law that the factual dispute should have been decided in accused's favor.

The decision of the Court of Military Review is affirmed.

Judge Cook concurs.

Ferguson, Senior Judge (dissenting):

I dissent.

If the issue presented by this case simply turned upon the resolution of a factual dispute involving the credibility of the Government's agents *vis-a-vis* that of the appellant, I would have no difficulty in joining my brothers in affirming this case. However, even assuming under the facts of this case that all questions of credibility were resolved adversely to the appellant at the trial level, this alone

does not end the inquiry. In each instance, regardless of an accused's testimony or lack thereof, the burden rests upon the prosecution to provide evidence of compliance with the necessary warning of an accused's right to remain silent and to be represented by an attorney. *Miranda v Arizona,* 384 US 436 (1966); *United States v Tempia,* 16 USCMA 629, 37 CMR 249 (1967).

In military trials, a pretrial statement of the accused may not be used, even for the purposes of impeachment, unless the prosecution can affirmatively show that the accused freely, knowingly, and intelligently waived his right to remain silent and to the assistance of counsel with respect to that particular statement. Paragraphs 140*a*(2) and 153*b*(2)(c), Manual for Courts-Martial, United States, 1969 (Rev); *United States v Jordan,* 20 USCMA 614, 44 CMR 44 (1971); *United States v Lincoln,* 17 USCMA 330, 38 CMR 128 (1967). As consistently held by this Court, at least until today, this burden of proof upon the Government to affirmatively show compliance with the warning requirements is to be proof beyond a reasonable doubt.[1] The Government is held to this same burden of proof both in proving that once properly warned, an accused subsequently waived his rights to remain silent and to counsel, *United States v Westmore,* 17 USCMA 406, 38 CMR 204 (1968), and in showing that a pretrial statement was given voluntarily.[2]

---

thing you said to them could be used against you?
A: I didn't know that, sir.
MJ: Did you know that there was no difference between a written statement and an oral statement?
A: No, I did not.
MJ: And were you told anything about that?
A: No, sir.
[11] In pertinent part, the instructions are as follows:
Now with regard to the right to remain silent, the burden is upon the prosecution to prove beyond a reasonable doubt that the accused knew that an oral as well as a written statement could be used against him. In this connection, if Agent Robinson was himself confused or unable to clearly explain this right to

the accused and as a result confused or misled the accused about this right and that is that the, the difference between a written and an oral statement, then the accused would not have waived his right to remain silent, and you must disregard any statements made by the accused on 16 November, and you may not consider it for any purpose whatsoever.

[1] *See, e.g.,* United States v Keller, 17 USCMA 507, 38 CMR 305 (1968); United States v Gustafson, 17 USCMA 150, 37 CMR 414 (1967).

[2] *See, e.g.,* United States v Howard, 18 USCMA 252, 39 CMR 252 (1969); United States v Barksdale, 17 USCMA 500, 38 CMR 298 (1968); United States v Mewborn, 17 USCMA 431, 38 CMR 229 (1968); United States v Odenweller, 13 USCMA 71, 32 CMR 71 (1962).

In attempting to establish the requisite proof beyond a reasonable doubt in the case at bar, the Government called two agents of the Criminal Investigation Division (CID).[3] One was Agent Robinson, who actually interviewed the appellant, the other was Agent Harrell, who claimed to have only been present during the initial phase of that interview when Agent Robinson purportedly warned the appellant of his rights. As noted extensively in the majority opinion, the accused also testified on these matters.

When initially testifying about this matter at a Article 39(a) session before the judge alone, Agent Robinson testified that he first advised the appellant that he was suspected of the sale and possession of heroin. Robinson related that he then advised the appellant of his rights by reading from a card. He continued with the following testimony:

A: I read it verbatim off the card. I then in turn asked the individual did he understand various words, such as counsel, and I explained to him. He said that he understood. I asked him, did he want to make a statement then. He said no, that he didn't want to make a statement. I also asked him did he want counsel then, and he said no. I asked him would he answer questions, he said some, you know, some of them, you know, I'll answer some of them. And I began to ask him questions.

MJ: And did you read the front and back portion of that card?

A: Yes, sir, I did.

.        .        .        .        .

MJ: Now did the accused indicate he would sign anything that day?

A: He did not want to make a statement of any type, a written statement.

MJ: That's what you mean by written statement?

A: Right.

MJ: Did the accused say written statement?

A: No. I asked him did he want to make a statement and he said no, that he didn't, sir. I explained to him, you know, when I say statement, like I asked him a question and then he'd give me the answer, and this would be typed on the correct document the 2800[4] that he would have to sign it. This was the statement that I was referring to. And I asked him did he understand it, and he said yes, he understood it. He waivered all his rights.

MJ: Insofar as an attorney?

A: Right.

MJ: And you asked him questions?

A: You want to answer questions? And he said he would answer, you know, some of my questions.

MJ: Let's come to that waiver now. You said, do you want counsel, and he said, no I don't want counsel. Then you said, do you want to make a statement?

A: I asked him, did he want to make a statement, and he said no, but he would answer some of the questions. And I went on asking, you know, where he got it from and—

Later, during this same testimony, Agent Robinson also related:

Q: Did you explain to him there was any difference between a written statement and an oral statement?

A: I explained to him that if he would make a statement that this would be—I'd ask him questions, this would be written down and he would give me, along with his answer, and then he would have to sign it after,

---

[3] In view of the fact that my brothers and I are apparently in disagreement over the sufficiency of the prosecution's evidence to establish a proper predicate for the admission of the appellant's statement into evidence, I find it necessary to set forth verbatim pertinent portions of the testimony, in addition to those portions set forth in the majority opinion, that was presented by the prosecution on this issue.

[4] This apparently refers to a CID form listing an accused's rights on the upper portion thereof. The lower portion of the form is blank and is apparently used as the place where any subsequently obtained statement or admission obtained from an accused is reduced to writing or transcribed.

after the, you know, the initial questioning had finished. This would all be typed up on the 2800 or something like a witness statement.

Q: What about his answering questions? What did you tell him about that?

A: Well, I told him that anything he said could be held against him. He, Girard cooperated as far as answering the questions.

When further pressed on cross-examination as to the specifics of his advice and the exact sequence of events relative thereto, Agent Robinson further explained:

Q: After you read him this and then you asked him, do you want to make a statement, his reply was no, is that correct?

A: Right, sir.

Q: Now why didn't you stop and not ask him any questions at that time?

A: Why did I stop?

MJ: Why did you not stop?

A: Why did I not stop asking him?

MJ: Right.

A: Questions? Okay, after I read him his rights and he told me that he didn't want, you know, a counsel well then—

Q: You figured he wanted to talk?

A: Well, yeah, you know, he said he would answer any questions, you know.

Q: When was that? Was this prior to your saying "Well, do you want to make a statement?"

A: Sir, after I read him everything off that card and explained it to him, this is when I asked him, after he said no, that he understood the card, the rights and the waiver, and he waived his rights, that's when I began to ask him questions. I didn't ask you—I didn't ask him any questions—

Q: When did you ask him, did you want to make a statement and his reply was no? After you finished reading that?

A: After I finished reading.

A: He didn't say that no he didn't want to make, you know, sign a state-

ment or make a written statement, in so many words.

Q: What do you mean "in so many words?"

A: You know, like I asked him, do you want to sit here and I ask you the questions and have somebody else write them down, then this is typed up on the necessary paper and he would sign it.

Q: So you asked him did he want to make a statement after all this had been read?

A: Yes.

Q: And he replied to that—no?

A: No.

Q: That he didn't want to make a statement, and you decided to go into it a little further?

A: Well, you know, he'd already said that he would answer any questions, that he'd answer some of them.

Later in the trial, when again called to the stand to testify before the court members on this issue, Agent Robinson reiterated that he read the appellant his rights verbatim from the card. He further explained:

WIT: . . . I read this and then I turned to him and I asked him, I said "Do you understand the meaning of counsel?" He said "Yes." I said "Do you want counsel?" He said "No." I said "Do you want to make a statement now?" I told him what the statement was. I said "This is where I ask you questions and the questions are written down. The answers to the questions are written down and later they are typed up and put on a certified witness statement." He said he didn't want to make a statement. I asked him would he consent to be questioned. He said "Yes, I'll answer some of your questions." And that was it.

A: I read the whole thing to him from front to back and then I asked him the question, did he understand the meaning of counsel, and did he want a counsel present. I also asked him did he want to make a statement. I explained to him what the word statement, you know, what type of

statement that I was talking about, and if he would consent to questioning.

Q: Now when did you ask him—is this what you are saying? That you said these particular things after you read this?

A: After I read the whole thing.

Q: Now when, Mr. Robinson, when you asked him whether he wanted to make a statement, what did he say?

A: He said, no, he didn't want to make a statement.

Q: Well, did you try to explain to him about what, did you stop at that time? Excuse me.

A: Well, like I explained to him, I said "Do you want to make a statement?" And I'd already explained to him what type of statement that I was talking about.

Q: When had you done that?

A: After I read the front and back of the card, sir.

Q: Well, did you ask him first whether he wanted to answer questions before you asked him anything about a statement?

A: No, only from what I read off the card.

Q: Did you ask him did he want to answer questions?

A: I asked him in the reading of the card, sir. It states in there, you know, that you can stop answering questions, you know, so forth and so on.

. . . . .

A: The next thing I asked him, I said "Do you want to make a statement?"

Q: What was his reply?

A: Well, then I explained to him first what I was talking about when I said statement, you know, like I'll ask you questions and somebody will write them down and you'll answer my questions that I ask you, and this will be typed up on a 28—a witness statement, and you'll have to sign it. He said no. I said, "Well, will you consent to being questioned?" He said "I'll answer some of your questions." And then I began to ask him questions.

Q: Then you started asking him questions?

A: Yes.

Q: Did you tell him at that point in time, Mr. Robinson, did you then try to explain to him that both an oral and a written statement could be used against him in court?

A: No, I didn't, only from what I read.

Q: That's the way you left it then after you asked him whether he wanted to answer questions, you started asking questions, without distinguishing between the oral and the written, and also explaining to him that both could be introduced against him in court?

A: Yes, sir, after I'd read, you know, after I'd read it to him, and I asked him just the questions that I just related to you that I asked him, as far as explaining counsel, lawyer and did he want to make a statement. I didn't—

MJ: What counsel is trying to get at, Mr. Robinson, did you differentiate between an oral statement made to you, that is questions and answers, and the written statement?

A: No, the only statement that I asked him about was the written statement and I explained that to him. I didn't go into asking, telling him that the oral statement, you know, could be held against him, etcetera.

Agent Harrell also testified for the Government in support of its burden to establish a proper warning of the appellant's rights. In thus testifying that he was present in the interrogation room and heard Agent Robinson read the appellant his rights, Agent Harrell stated that the appellant declined to make a written statement when Agent Robinson asked him whether or not he wished to make a statement. When Agent Robinson later asked the appellant if he would answer questions, however, Agent Harrell related that the accused replied that he would answer some questions. According to Agent Harrell's further testimony, moreover, Agent Robinson did not explain to the appellant that either an oral or written statement could later be used against him.

The foregoing extracts of Agent Robinson's trial testimony, particularly those

portions relating to his advice about the possible distinction between later use of written or oral statements as evidence against the appellant and subsequent criminal proceedings, is at best ambiguous. To a certain extent it is also evasive. In any event, however, this much appears clear. When originally warning the appellant of his rights, Agent Robinson, by reading them verbatim from the card, stated to appellant, "Any statement you may make may be used as evidence against you in a criminal trial." In later explaining what he meant by the word "statement," Agent Robinson unequivocally stated to the appellant that he was only referring to a written statement, signed by the appellant, in which the questions and the responses had been recorded. This testimony likewise contains no conflict as to the fact that the appellant refused to make such a statement. The only ambiguities in the prosecution's evidence as supplied by Agent Robinson's testimony relate to the possible effect and sequence of events relative to the question, likewise ostensibly read directly from the card, wherein Agent Robinson asked, "Do you consent to being questioned?" Although the appellant apparently then indicated that he would answer some questions and did in fact do so, the Government's own evidence is both contradictory and ambiguous with respect to the critical issues in this case of whether the appellant's initial assertion of his right against self-incrimination should have precluded further interrogation or whether the appellant was affirmatively misled into believing that only a signed written statement could later be used against him.

We confronted an almost identical factual situation in *United States v Bollons,* 17 USCMA 253, 38 CMR 51 (1967). The evidence presented by the Government in attempting to meet its burden of establishing a proper predicate for the admission in evidence of certain pretrial statements of the accused in that case was likewise unclear and uncertain. An OSI agent named Rielly, after fully advising the accused of his rights, interrogated him for at least a couple of hours. During that interrogation, according to Rielly's trial testimony, the accused

made certain statements in response to some of his questions but also answered several others by stating that he did not want to make any statement that could later be used against him and did not want to incriminate himself. Rielly's testimony was ambiguous on the crucial question of the time sequence between the appellant's assertion of his right to remain silent and the continuation of the interrogation. In rejecting the Government's argument that the facts merely disclosed that the accused, with full knowledge of his rights, engaged in an absolutely voluntary conversation with Agent Rielly in which he determined to exercise his rights only on a selective basis, we held that the statements of the accused should not have been admitted in evidence because Agent Rielly's testimony did not *clearly and convincingly demonstrate* that the statements were made before the accused's assertions of his right to remain silent. In writing for an unanimous Court, Judge Quinn there stated:[5]

> Whether Rielly's testimony requires the conclusion, as the accused contends, that he asserted his right to remain silent prior to any interrogation need not detain us. The burden is on the Government to establish the proper predicate for the admission in evidence of an inculpatory pretrial statement by the accused. United States v Lake, 17 USCMA 3, 37 CMR 267. In our opinion, that burden was not met because it does not convincingly appear that the incriminating statements were made before the accused asserted his right to remain silent.

Although recognizing that some of Agent Robinson's testimony in the case at bar is not clear, the majority opinion attempts to resolve those inherent ambiguities in the Government's own proof by simply asserting that the testimony of the appellant was not found credible by the court below. In so finding, my brothers apparently further conclude, despite their recognition of the inherent ambiguities in Agent Robinson's trial testimony, that his advice would not have misled a

[5] *United States v Bollons,* 17 USCMA 253, 256–57, 38 CMR 51, 54–55 (1967).

person of ordinary intelligence. With neither the prosecution nor the defense directly presenting any evidence on this issue at trial, moreover, their principal opinion thus finds that the appellant was such a person of ordinary intelligence and, hence, concludes that he was not misled.

As long recognized by the Supreme Court of the United States, however, the courts of this country " 'indulge every reasonable presumption against waiver' of fundamental constitutional rights and . . . 'do not presume acquiescence in the loss of fundamental rights.' " *Johnson v Zerbst,* 304 US 458, 464 (1938). Given that mandate, even when considering the evidence in this case in the light most favorable to the Government, I am unable to conclude that the Government has here carried its burden to clearly and convincingly demonstrate that the appellant made a voluntary, knowing and intelligent waiver of his right to remain silent as required by *Miranda* and *Tempia.* I would accordingly reverse the decision of the United States Army Court of Military Review and allow a rehearing.